In re the DECOR NOEL CORPORATION, Debtor-in-Possession.

The DECOR NOEL CORPORATION, Plaintiff–Appellant,

v.

V. ALEXANDER & CO., INC., Defendant–Appellee.

No. 86–2868–HB.

United States District Court, W.D. Tennessee, W.D.

May 31, 1991.

William A. Carson, II, Lucian O. Pera, Memphis, Tenn., for plaintiff-appellant.

Preston Wilson, Memphis, Tenn., for defendant-appellee.

## ORDER AFFIRMING THE DECISION OF THE BANKRUPTCY COURT

HORTON, Chief Judge.

The Court must decide whether Decor Noel's payments totaling $14,677.52 were made in the ordinary course of business and not subject to § 547(b) avoidance.

After a *de novo* review of the record, transcripts, exhibits, briefs of both parties and ruling of the Bankruptcy Court, this Court AFFIRMS the Bankruptcy Court's ruling that the preferential payments made by Decor Noel to V. Alexander, other than the $1,133.20 payment, are excepted from avoidance because they were made in the ordinary course of Decor Noel's business.

## BACKGROUND

Plaintiff-appellant, Decor Noel Corporation, also the debtor in possession, manufactures and sells Christmas decorations and ornaments. (Alex. Tr. p. 17). Decor Noel's highly seasonal business depends on prompt delivery of imported raw materials to its Memphis plant and prompt shipment of finished goods.

Defendant-appellee, V. Alexander Company, an international freight forwarder and import agent doing business in Memphis, Tennessee, had done business with Decor Noel for at least seven years prior to the filing of Decor Noel's Chapter 11 bankruptcy petition.

Decor Noel seeks to avoid and recover alleged preferential transfers made to V. Alexander. Decor Noel avers the payments were proscribed by 11 U.S.C. § 547(b) and, after due credits were given, V. Alexander owed Decor Noel the amount of $14,677.52.

On December 11, 1985, V. Alexander answered, asserting Decor Noel's payments to V. Alexander in the amounts of $8,349.98 and $1,133.20 were *not* subject to avoidance because:

1.  The payments were in the ordinary course of business;
2.  There was a contemporaneous exchange;
3.  They were acting for the benefit of the U.S. government by collecting taxes and import duties. Thus the funds collected are entitled to priority pursuant to 11 U.S.C. § 507(a)(7)(F) and are not dischargeable under § 523(a)(1);
4.  The only preferential payment would be V. Alexander's commissions, i.e., $397.25.

On April 18, 1986, V. Alexander filed its memorandum brief on "Ordinary Course of Business Payments".

Within the brief, V. Alexander asserted it billed it's customers charges, plus commission of approximately 3.1%, and advanced the money to pay for the items ordered. Next, V. Alexander also asserted Decor Noel usually paid within thirty-two (32) days of invoicing and the payments did not cause a reduction in antecedent debt to the prejudice of other creditors. Finally, V. Alexander asserts Decor Noel and V. Alexander continued their "normal financial relations" as they had for many years. *Id.* at 2.

On June 9, 1986, Decor Noel amended their complaint, asserting V. Alexander was liable in the amount of $26,902.52. A trial on the merits was held before Bankruptcy Judge Leffler, who, ruled all of the payments, other than the $1,133.20 payment, were excepted from avoidance under the "ordinary course of business" exception found in 11 U.S.C. § 547(c)(2). (Alex. Tr. pp. 58–59). Consequently, on October 3, 1986, the bankruptcy court entered an order of judgment in favor of the debtor in the amount of $1,133.20.

On October 9, 1986, Decor Noel appealed, presenting one issue for review, namely:

Whether the bankruptcy court erred in ruling that all payments made by Decor Noel, with the exception of $1,133.20 to V. Alexander, within the ninety (90) day preference period, were in the ordinary course of business, and thus, were excepted from avoidance per 11 U.S.C. § 547(c)(2).

Both parties have briefed the issue and there have been no other filings in this action.

## FACTS

Decor Noel filed a voluntary petition in Chapter 11 bankruptcy, on February 6, 1985. (Alex. Tr. p. 17). Decor Noel's business required prompt servicing of its customers, prompt receipt of raw materials and prompt deliver of finished products. Prior to filing the petition, V. Alexander delivered and imported raw materials necessary to make Decor Noel's product line for approximately seven years.

Mr. Mike Barnett, chief financial office and vice-president in charge of V. Alexander's Memphis office, testified that Decor Noel was billed as follows:

1. *Ocean Freight —*
   a) Documents received in advance of arriving cargo;
   b) Prepare invoice;
   c) Present invoice to Decor Noel; and,
   d) Upon arrival:
      (i) release items from customs;
      (ii) within ten (10) days, after the cargo's release, deposit duties, on behalf of Decor Noel, with U.S. Customs.
2. *Air Freight —*
   a) Receive documents with the cargo;
   b) Prepare invoice after the release of cargo;
   c) Deposit duty on behalf of Decor Noel, within ten (10) working days of release of cargo.

(Alex. Tr. pp. 23–24).

Decor Noel's chief financial officer and treasurer, Jack Harris, the primary witness in the adversary proceeding, had direct supervisory authority over accounts payable, as well as the borrowing of all funds. Mr. Harris testified that Decor Noel received 100% of its working/operating capital from CitiCorp Industrial Credit, Inc. (hereinafter "CitiCorp") with all receivables, inventory and fixed assets pledged as collateral. (Alex. Tr. pp. 15–19, 25–26).

Every day Mr. Harris computed the amount Decor Noel needed to operate. He then figured, on what he referred to as the "summary worksheet", Decor Noel's daily banking position. The daily banking position referred to the amount Decor Noel could borrow from CitiCorp on a particular day. The amount was determined by calculating the credit amount available from CitiCorp, that is, the Pre–Approved loan ceiling (Decor Noel had one of $11,400,000.00) minus the outstanding loan balance due to CitiCorp. Decor Noel received the money via CitiCorp's disbursement account, maintained at First Tennessee Bank in Memphis, Tennessee.

Mr. Harris testified the CitiCorp and Decor Noel agreement calculated "remaining debt" by adding the sum of eighty-five percent (85%) of the value of Decor Noel's receivables, less than 30 days past due, plus seventy-five percent (75%) of Decor Noel's inventory. This figure represented the maximum amount Decor Noel could borrow (not exceeding "the fixed loan ceiling" of $11,400,000.00) on a given day. (Alex. Tr. p. 29, line 2–13).

Decor Noel's former comptroller also testified that Decor Noel's ordinary course of collecting accounts receivables was to:

1. "Seasonally" date of all invoices;
2. have the majority of their invoices due on December 10 of the year of sale (in the instant case, 1984);
3. have all shipments delivered on or about the first of December.

Mr. Harris testified he always tried to improve Decor Noel's operating situation, but bills were being paid some thirty (30) to forty (40) days after invoices were received. He next testified it was Decor Noel's policy, for about one year, to date checks "... as if they were going to be mailed and paid concurrently." Later Mr. Harris would check Decor Noel's loan availability with CitiCorp. If there were funds available he would pay the employees first from the oldest checks. (Alex. Tr. p. 32, lines 1–12). Continuing, Mr. Harris testified Decor Noel, prior to October 18, 1984, usually borrowed as they wanted and paid bills as they saw fit ... according to availability. Decor Noel repaid CitiCorp by depositing money directly into CitiCorp's "accounts receivable" account at First Tennessee Bank. Mr. Harris clearly stated Decor Noel had *no authority* or *control* over the account. (Alex. Tr. p. 33, lines 4–20) (emphasis added).

During September 1984, board chairman Mr. Kosberg's personal guarantee of $800,-000.00 expired. In October of 1984, Decor Noel *sought* a new $500,000.00 line of credit with CitiCorp guaranteed by new board president Mr. Kaplan. However, CitiCorp did not raise this troubled company's debt ceiling. Decor Noel reacted by shifting disbursements, always paying payroll and payroll taxes.

However, on October 18, 1984, Decor Noel's financial position changed drastically. On that day the value of assets exceeded the credit ceiling [Mr. Harris testified that Decor Noel's had effectively borrowed $309,000.00 above their debt ceiling; causing a negative remaining debt figure], thus Decor Noel could not borrow any more money.

Mr. Harris testified two prerequisites were needed to keep Decor Noel "afloat" ... the completion of product manufacturing and the shipping of orders. In response, Decor Noel air freighted raw materials for KMART's order, their biggest customer. Decor Noel only paid those suppliers of necessary raw materials and wanted to fulfill the balance of the majority of its sales. (Alex. Tr. p. 35, lines 12–24); *See also,* (Decor brief, p. 6, filed December 4, 1986).

Mr. Harris generally agreed with defense counsel Carson's statement that "prior to mid-October ... you weren't at that time in a situation where you had negative debt availability and your normal procedure, which was to try to pay the oldest bills first attained; and after mid-October you had to change it because of those problems with getting additional funds[.]" (Alex. Tr. p. 36, lines 2–13).

After mid-October Decor Noel called CitiCorp to request daily their operating expenses. Decor Noel showed a loss on its books and projected a one-half million dollar loss for 1984.

In addition, Mr. Harris testified that Decor Noel continued to pay V. Alexander within thirty (30) days after October. Mr. Harris also testified that on November 5, 1984, the debt ceiling was increased to $12.4 million. On November 6, 1984, Decor

Noel was given additional lending authority allowing the acquisition of $384,000.00 of availability. (Alex. Tr. p. 38). Mr. Harris admitted that on November 30, 1984, the remaining debt available was $1,099,000.00, (Alex. Tr. p. 41, line 14), which implies that during November, the CitiCorp loan was paid below the amount of $11.4 million. It was also established that:

1. On October 17, 1984, the combined credit availability was $382,491.00;
2. Decor Noel's total debt amounted to $11,384,380.02;
3. Decor Noel's total debt ceiling was $11,400,000.00;
4. Theoretically, there was available for loan approximately $382,000.00;
5. Realistically, Decor's debt availability was $15,619.98;
6. On November 30, 1984, the remaining debt available was $1,099,000.00; and,
7. On said date the combined availability was a *negative* (—)$1,247,000.00. (Alex. Tr. pp. 40–44).

Mr. Harris also testified the CitiCorp loan agreement cited three loan factors; and of the three, two were mainly used ... availability versus loan ceiling. (Alex. Tr. p. 42, lines 18–21). Mr. Harris further asserted, that on or about November 15, 1984, Decor Noel removed its inventory's value from the calculation of availability; and as a result, on November 19, 1984, they were $1,800,000.00 over the available line of credit. Not withstanding, CitiCorp continued to let Decor Noel borrow, even though there was a negative combined availability.

Mr. Harris' testimony established that Decor Noel paid CitiCorp as collections were made from accounts receivable. Mr. Harris testified that in December of 1984, Decor Noel paid out of borrowed funds, approved by CitiCorp, creditors selectively listed because Decor Noel had exceeded their credit availability limit.

Finally, the parties have stipulated to all the elements of a preference, except the presence of an antecedent debt. (YUL Tr., p. 9). However, the court below found that

all of the elements of a preference were satisfied. (Order entered October 17, 1986, p. 1). There have been no other filings in this cause.

## APPLICABLE LAW AND CONCLUSIONS

■ District courts have jurisdiction over appeals from decisions of bankruptcy courts. However, the Supreme Court's plurality opinion in *Northern Pipeline Construction Company v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expressed concern over the fact that

> § 241(a) of the Bankruptcy Act of 1978 has impermissibly removed most, if not all, of 'the essential attributes of the judicial power' from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of congress' power to create adjuncts to the Art. III courts. 458 U.S. at 88, 102 S.Ct. at 2880.

■ Shortly thereafter, 28 U.S.C. § 157(b)(2) was enacted. Section 157(b)(2) classifies bankruptcy proceedings as core or noncore. Bankruptcy judges may only enter final orders in core proceedings. The instant cause is classified, under § 157(b)(2)(F), as a core proceeding; and accordingly, a bankruptcy judge may enter a final order. Section 158(a) provides the jurisdictional basis for district courts to hear the appeals of final orders. In the instant cause, the ruling of Judge Leffler is reviewable as a final decision, and thus, jurisdiction is proper.

There are two standards of review on appeals from bankruptcy court judgment, *de novo* and clearly erroneous. In the Sixth "[f]act findings of the bankruptcy court are reviewed for clear error. But where the bankruptcy court's fact finding arises from a misunderstanding of the law is reviewed for plain error of law." *In re Fulghum Construction Corp.*, 872 F.2d 739, 742 (6th Cir.1989) (citations omitted) (*quoting, Morgan v. K.C. Machine & Tool Co.*, 816 F.2d 238, 244 (6th Cir.1987)). The only issue for review in this appeal is:

Whether the bankruptcy court erred in holding Decor Noel's payments, with the exception of one payment in the amount of $1,133.20 made to V. Alexander, ninety (90) days before filing of the bankruptcy petition, were in the ordinary course of business.

The parties have stipulated to the elements of a preference, per § 157(b)(1), (2), (3), (4) and (5). (Reply Brief of Decor Noel p. 7). Subsection (c) of § 547 lists preferential payments that are not avoidable. In particular, § 547(c)(2)(A), (B) and (C), the ordinary course of business exception reads as follows:

> The trustee may not avoid under this section a transfer ... to the extent that such transfer was ... (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

The highly respected treatise, *Collier on Bankruptcy* has written,

> "[t]o fall within the 'ordinary course' of business exception, a transferee must show that": (i) the underlying debt of which payment was made was "incurred in the ordinary course of business or financial affairs" of both parties; (ii) the transfer was made "in the ordinary course of business of financial affairs" of both parties, and; (iii) the transfer was made according to ordinary business terms." 4 *Collier on Bankruptcy*, § 547.10, pp. 547–50 (L. King & K. Klee, 15th ed. 1990).

*Collier* also states court testing the ordinariness of a transaction should generally focus on prior conduct of the parties, the common industry practices; and particularly, whether payment resulted from any unusual practice. 4 *Collier, supra*, at pp. 547–50 ¶ 547.10 (citations omitted) (footnotes omitted). The Sixth Circuit recently ruled in *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), that "... [a] court's inquiry must be directed to an analysis of the business practices which

were unique to the particular parties under consideration, and not to practices which generally prevailed in the industry of the parties." *Id.* at 743 (citations omitted). Courts must look to the record to see if there has been any "unusual action by either debtor or creditor" to help them collect or pay on the deal. *In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986).

*Collier* also states that courts have denied § 547(c)(2), ordinary course of business protection, to transfers commonly known as "Ponzi Schemes." 4 *Collier, supra*, at pp. 547-51, ¶ 547.10 (footnote omitted). However, the record before the court does not support the presence of a "Ponzi Schemes" i.e., the use after acquired funds to pay off previous debt.

Late payments have also been held to be in the ordinary course of business "when such payments were well-established between the parties." 4 *Collier, supra*, at pp. 547-51, ¶ 547.10; *see also, Yurika Foods Corp. v. United Parcels Service*, 888 F.2d 42 (6th Cir.1989) (late payments fell within the ordinary course transfer based on evidence of late payment practice between the parties and the industry in general). 4 *Collier, supra*, at pp. 547-51, ¶ 547.10, fn. 8.

In the instant cause, Decor Noel and V. Alexander had done business for "several years" with similar late payments being made and accepted. (Alex. Memorandum Brief on "Ordinary Course of Business Payments", § 547(c)(2), p. 2 (filed April 18, 1986). In fact, V. Alexander, the importer of the raw products most often used, invoiced in different ways dependent on the way that the product imported was shipped, by ocean or air freight, in response to Decor Noel's need. The instant cause involves materials shipped via air as previously discussed; invoices were sent out soon after the product was released to Decor Noel. Decor Noel's method of payment, between September and the end of 1984, was to pay the V. Alexander invoices anywhere from twenty-five (25) to thirty (30) days after invoicing. (Alex. Tr. p. 25, line 2).

As of November 8, 1984, ninety (90) days prior to the filing of this cause, the preference period began and the following payments are at issue:

| Check # | Inv. Date | Check Date | When Paid | Amount |
|---|---|---|---|---|
| 755 | 9/27 | 10/12/84 | 11/8/84 | $1,133.20 |
| 822 | 10/4 & 5 | 10/19/84 | 11/8/84 | 8,342.98 |
| 833 | 10/15 | 10/26/84 | 11/16/84 | 1,150.00 |
| 940 | 10/16 & 24 | 11/2/84 | 11/16/84 | 8,044.00 |
| 1010 | 10/30 | 11/9/84 | 11/29/84 | 50.50 |
| 1055 | 11/5 & 6 | 11/16/84 | 11/23/84 | 4,030.86 |
| 1103 | 11/13 & 15 | 11/23/84 | 11/29/84 | 8,194.14 |

(Alex. Memorandum Brief on "Ordinary Course of Business Payments", Section 547(c)(2), exhibit 1, filed April 18, 1984).

----

■ However, the recent Sixth Circuit case *In re Belknap, Inc.*, 909 F.2d 879 (6th Cir.1990), requires a closer look to each payment. In *Belknap*, the court held, for the purposes of a transfer under the 1978 Bankruptcy Act, delivery occurs upon actual receipt of a check by the creditor. *Id.* at 883-84. Applying *Belknap*, the date of payment of check Nos. 755, 822, 833 and 940 provide the basis for the inference that the date of payment by the drawee bank was the date of their receipt. The court also finds persuasive, the parties' stipulation to the prerequisites of a preference as required by § 547(b)(1), (2), (3), (4), and (5).

(Reply Brief of Decor Noel p. 2 (citations omitted) (footnotes omitted)).

Accordingly, this court finds, based on the record and the stipulation of the parties, that check Nos. 755, 822, 833 and 940 were preferential transfers within the meaning of § 547(b). The other checks and invoice dates clearly fall within the ninety (90) day period and are preferential per § 547(b) *et seq.*

■ The court also affirms, based on a *de novo* review of the record, the finding of the bankruptcy court that Decor Noel usually delayed paying V. Alexander invoices no less than fifteen (15) days and that the largest delay in payment was forty-two (42) days. (Check No. 755, invoice dated 9/27/84, check dated 10/12/84, check paid 11/8/84) (*see,* exhibit 1 filed with Alex. Tr.). Additional support is found in an analysis of the invoices and the dates of payment. Both are quite instructive in determining Decor Noel's ordinary course of payment of V. Alexander invoices. Decor Noel paid V. Alexander in the following manner, prior to November 8, 1984:

(Days after Invoice (DAI)            (No. of Times Late (Freq.)

| DAI | Freq | DAI | Freq | DAI | Freq |
|---|---|---|---|---|---|
| 15 days - | 2 times | 16 days - | 2 times | 18 days - | 3 times |
| 20 days - | 1 time | 21 days - | 1 time | 22 days - | 4 times |
| 24 days - | 2 times | 27 days - | 4 times | 28 days - | 7 times |
| 29 days - | 8 times | 30 days - | 2 times | 31 days - | 2 times |
| 32 days - | 1 time | 33 days - | 1 time | 34 days - | 2 times |
| 35 days - | 2 times | 36 days - | 2 times | 39 days - | 1 time |

After November 8, 1984 the following payment pattern existed:

| DAI | Freq | DAI | Freq | DAI | Freq |
|---|---|---|---|---|---|
| 17 days - | 1 time | 18 days - | 1 time | 23 days - | 1 time |
| 24 days - | 1 time | 25 days - | 3 times | 26 days - | 1 time |
| 30 days - | 1 time | 31 days - | 1 time | 32 days - | 1 time |
| 34 days - | 1 time | 35 days - | 1 time | 42 days - | 1 time |

---

A comparison of "pre" to "post-preference" payments shows one payment beyond the time lag experience by V. Alexander prior to November 8, 1984. Bankruptcy Judge Leffler ruled Check No. 755 was not a payment in the ordinary course of Decor Noel's business. Check No. 755, when compared against other payments, does not fall within any lag periods previously experienced by V. Alexander.

This Court's inquiry is guided by *In re Fulghum Construction Corp.,* 872 F.2d 739 (6th Cir.1989). The *Fulghum* holding requires the business practices unique to V. Alexander and Decor Noel, prior to the ninety (90) day preference period to serve as a "marker". These practices circumscribe the exclusion of all payments made, except Check No. 755 in the amount of $1,133.20, from Decor Noel's § 547(b) avoidance powers. Prior to the preference period, V. Alexander twice received payments 34, 35 and 36 days late! During V. Alexander's course of dealing with Decor Noel there were a total of six late payments made by Decor Noel and accepted by V. Alexander. This pattern is highly illustrative of their ordinary course dealings. The bankruptcy court was correct when it included all of the aforementioned preferential payments within § 547(c)(2)'s ordinary course of business exception. The bankruptcy court also did not err by not excepting Check No. 755, a late payment, from avoidance under § 547(c)(2).

There is no evidence in this record of any unusual action by the parties to collect or pay the debt. Decor Noel, prior to and after filing, operated on a day-to-day basis. During mid-October Decor Noel borrowed from CitiCorp according to a formula that existed prior to the preference period.

There was no change in the manner or method used to complete business transactions. Mr. Harris testified that Decor Noel's financial position changed drastically. However, there was neither an increase in the debt ceiling, nor a change in the way Decor Noel acquired its operating capital. (*See* Alex. Tr. pp. 29–35). The change in financial condition, as relied upon by Decor Noel, is not unusual for a company that is experiencing both cashflow problems on one hand and fighting bankruptcy's "slippery slope" with the other. Mr. Harris best articulated Decor Noel's state of affairs:

> [w]e were still manufacturing and we were running behind because ... we were late getting light sets out of Taiwan, and our largest customer was the primary purchaser.... I had to make sure that I kept money used more appropriately for the payroll and the payroll taxes and to do these things, to keep merchandise coming in.

(Alex. Tr. pp. 31–32, pp. 33–36).

The crux of V. Alexander's argument is that congressional policy should guide this court. On page two of V. Alexander's brief, the intent of the ordinary course of business exception is aptly stated:

> ... the second exception protects ordinary course of business transfers. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage creditors during the debtor's slide into bankruptcy. (Reply brief of plaintiff-appellant, pp. 18–19).

The court below was correct. The policy considerations of §§ 547(c)(1), (2) and (4), are all designed to encourage creditors to deal with a failing business and to protect ordinary business transactions. The "ordinary course of business" exception encourages and facilitates rehabilitation by encouraging creditors to continue doing business with the troubled enterprises. There was no change in the pattern of payments by Decor Noel. The payments made were all usually within thirty (30) days of invoicing, except the "42 day payment."

After a careful review of the entire record in this appeal, this Court AFFIRMS the ruling of the Bankruptcy Court. The appeal is dismissed, which is so ORDERED.