**In re DAEDALEAN, INC., Debtor.**

**Paul D. TRINKOFF, Disbursing Agent for Daedalean, Inc., Plaintiff,**

**v.**

**PORTERS SUPPLY CO., INC., et al., Defendants.**

**Bankruptcy No. 91–5–2726–SD. Adv. No. 93–5197–SD.**

United States Bankruptcy Court, D. Maryland, Baltimore.

Feb. 8, 1996.

Paul D. Trinkoff, Mary Fran Ebersole, Tydings and Rosenberg, Baltimore, Maryland, for Debtor/Disbursing Agent.

Matthew T. Angotti, Baltimore, Maryland, for Defendant Products Supports, Inc.

*MEMORANDUM OPINION GRANTING, IN PART, AND DENYING, IN PART, MOTION TO DISMISS COUNT 3 OF COMPLAINT TO AVOID AND RE-COVER PREFERENTIAL TRANS-FERS*

E. STEPHEN DERBY, Bankruptcy Judge.

The Debtor, Daedalean, Inc., through the disbursing agent under its confirmed plan of liquidation, Paul D. Trinkoff, has filed a complaint that seeks in Count 3 to avoid and recover several payments made by the Debtor to the Defendant Products Supports, Inc. as preferential transfers under 11 U.S.C. §§ 547(b) and 550(a). The Defendant does not deny that these transfers took place; instead, the Defendant asserts three affirmative defenses against the Debtor's preferential transfer claims.

Defendant first contends that the transfers at issue occurred during the military Operations Desert Shield and Desert Storm and, therefore, that the Defense Production Act of 1950 ("DPA") and supplemental regulations required it to continue shipping its goods to the Debtor irrespective of payment. It argues that these exigent circumstances mitigate against a finding that any late payments were preferential transfers. Next, Defendant alleges that, pursuant to § 547(c)(2), these transfers were incurred in the ordinary course of business between it and the Debtor, and that payments were made within the standard payment time of the industry during the Persian Gulf crisis. Finally, the Defendant contends that, even if these payments are avoidable preferential transfers, pursuant to 11 U.S.C. § 547(c)(4) any recovery must be offset and reduced by the amount of new value given by the Defendant to the Debtor.

The Defendant has filed a motion to dismiss the Debtor's § 547(b) claim on the grounds stated above. In support of its motion, the Defendant supplied the court with affidavits and exhibits. With its opposition to the motion, the Debtor filed its own exhibits. Because matters outside the pleadings have been presented, the court has treated the Defendant's motion as one for summary judgment. Fed.R.Civ.Pro. 12(b), made applicable by Fed.R.Bankr.Pro. 7012(b).

## I. FACTS

The Debtor, incorporated in 1972, was primarily a military contractor, researching and developing military technology. The Debtor was a participant in the United States Small Business Administration Section 8A Program. In 1984, it delivered to the military its first training system known as the CH–47EST. Thereafter, the Debtor developed an expertise in the development and production of trainers for the military, and it expanded its business into the system support and electronic warfare markets.

Debtor's success came to a halt in 1991, when its President, Alagu Thiruvengadam, and its Executive Vice–President, Ambrose A. Hochrein, pled guilty to tax evasion charges relating to their 1984 personal federal income tax returns. Soon after, the United States Navy Debarment Committee proposed the debarment of the Debtor from all government contracts. As a consequence of this action, the Debtor filed bankruptcy under Chapter 11 of the Bankruptcy Code in the District of Maryland on April 30, 1991. Pursuant to a Revised Joint Plan of Reorganization filed by the Debtor and the Unsecured Creditors' Committee, as confirmed by the court April 13, 1993, the Debtor transferred to Paul D. Trinkoff, its disbursing agent, all powers it had pursuant to the Bankruptcy Code, including the right to avoid and recover preferential transfers.

During the Gulf War, the Debtor supplied the United States military with necessary military equipment. One of the contracts that thrust the Debtor into this role was with the Naval Sea Systems Command, Department of the Navy, Washington, D.C., Contract No. N000025–88–C–2217, dated September 28, 1988, (the "Contract"), to provide the federal government with AAVP7A1 Automatic Fire Sensing and Suppression Systems Hardware Kits, Test Sets, First Article Test Support Packages, and Interim Support Packages. The Contract was promulgated pursuant to the DPA. 50 App. U.S.C. § 2061, *et seq.* (1995). The sections of the DPA applicable to this case have not materially changed since the signing of the Contract. The DPA authorizes the President to require that contracts in support of the national defense have priority over all other contracts and to allocate materials and facilities so as to promote the national defense. In turn, because the President has delegated his authority under the DPA to other branches of government, the Defense Priorities and Allocation System, ("DPAS"), 15 C.F.R. Part 700, *et seq.* (1995), and the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1, *et seq.* (1995), also applied to the Contract. Again, as applicable, these regulations remain essentially the same today as they did when the Contract was first signed.

In order to carry out its contract with Naval Sea Systems Command, the Debtor entered into a subcontract with the Defendant, (the "Subcontract"). Like the Contract, the Subcontract was promulgated in

accordance with the DPA, DPAS and FAR. Under the Subcontract, the Defendant was required to supply the Debtor with military equipment that senses and suppresses fires in tanks and other assault weaponry. These devices were a necessary component for military operations in the Middle East. As the conflict with Iraq became inevitable, the priority rating of the Contract was raised to a DO rating, the second highest priority rating under the DPA. *See* DPAS 15 C.F.R. § 700.11. As will be discussed, the parties argue what consequence a DO rating had on the Defendant's legal obligations to the Debtor.

Throughout the Desert Storm and Shield conflicts, the Defendant continued to ship to the Debtor the necessary fire sensing and suppression military equipment it required, despite the Debtor's increasingly late payments. Several of these late payments occurred either on or within the 90 days before the Debtor filed bankruptcy; i.e. inside 11 U.S.C. § 547(b)'s preferential transfer period. *See* Appendix A.

The parties differ as to the periods between when payments were billed and when they were paid during the 90 day preference period. The Defendant calculates the average period to be 80.89 days. According to the Debtor's figures, the average is 87.9 days. The discrepancy between these two figures is that the Defendant calculated the time of payment by the date the check arrived, as opposed to computing the time by the date the check actually cleared, which is the way the Debtor determined the average.

The parties also disagree as to what the average time for such payments was prior to the preference period. The Defendant estimates the average time between the invoice and the payment to be 65.81 days, while the Debtor believes it to be only 58.09 days. The variance in these estimates is the result of several factors. The primary factor is that the parties disagree on the period to be examined in determining this average. The Defendant uses a period of nine months before the preference period, while the Debtor's calculations are based on one full year prior to the preference period.

The Defendant also claims that it made three shipments of goods to the Debtor on January 31, 1991, February 4, 1991, and February 13, 1991, which total $30,381 in new value. Defendant asserts that the entire $30,381 can be offset against the Debtor's preference claim under 11 U.S.C. § 547(c)(4). For its part, the Debtor admits that the February 4, 1991 shipment valued at $13,284 and the February 13, 1991 shipment valued at $4,551, totalling $17,835, may offset any previous preferential payments. It argues, however, that the Defendant may only offset $17,801.17, the amount of the preferential payment it made to the Defendant prior to receiving these shipments. It further contends that the January 31, 1991 shipment was paid on April 8, 1991 with a check for several invoices in the amount of $41,561,20. Debtor points out that the invoice for the January 31, 1991 shipment was issued on the same day and for the same amount ($17,546) that the Defendant is claiming as a new value credit. Since the January 31, 1991 shipment was the same day as the January 31, 1991 payment, Debtor argues it does not constitute new value given "after such transfer"; and the § 547(c)(4) new value exception is not applicable. Debtor points out that one of the invoices that its April 8, 1991 check was payment for was a shipment by the Defendant on January 31, 1991 in the amount of $12,546. Debtor argues that this coincidence proves it paid for the January 31, 1991 shipment and that, therefore, the shipment cannot be used as new value to offset its preference claim.

## II. PREFERENTIAL TRANSFERS
## § 547(b)

Section 547(b) allows a trustee or debtor-in-possession to avoid a pre-bankruptcy transfer of a debtor's assets if the transfer is: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables such creditor to receive more than such creditor would receive if the case were a case under Chapter 7 of the Bankruptcy Code and the transfer had not been made. 11 U.S.C. § 547(b)(1–5). There is no dispute that the

transfers in this case fall within § 547(b)'s definition of preferential transfers. Rather, the debate focuses on whether one of the shields with which a transferee can defend against a trustee's avoidance powers applies.

## III. DEFENSE PRODUCTION ACT

■ The Defendant argues that the DPA required it to continue supplying the Debtor with essential military equipment during Desert Storm and Shield, regardless of payment. "Products Support, as a defense contractor, was required to manufacture and ship essential military component parts to the Debtor for installation and use during the Persian Gulf War irrespective of whether Products Support was paid for this military hardware." MOTION OF PRODUCTS SUPPORT, INC., TO DISMISS COUNT 3 OF COMPLAINT TO AVOID AND RECOVER ALLEGED PREFERENTIAL TRANSFERS at 3. The Defendant contends that the DPA thus creates mitigating circumstances that preclude late payments, which would otherwise be preferential transfers, from being avoided under § 547(b).

In support of this proposition, the Defendant cites to the DPA generally, forcing the court to wade through the Defense Production Act without any guidance. Having carefully scrutinized all of its sections, the court finds only one section on which the Defendant may have based its argument, namely, 50 App. U.S.C. § 2071. Titled *Priority in Contracts and Orders*, § 2071(a)(1) authorizes the President "to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of performance...." *Id.*

This sub-section does not mandate that a supplier continue to supply goods when payment is late or not forthcoming. Rather, the DPA directs priority be given to manufacturing defense products over non-defense products during times of military strife. *Id.* One way of looking at the DPA is that it allows

higher rated contracts to cut in front of lower rated contracts. However, just because someone is first in line, does not mean that person is required to be served. In other words, as the Debtor points out, a defense contractor that produces both guns and butter is required to produce all needed guns before it produces butter. *See Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, fn. 1 (1992) ("The DX–C2 designation [which is higher priority than a DO rating] means that the item is on the President's urgent master list of defense procurements. In practical terms, a DX rating means the contractor, its subcontractors and suppliers, are to perform the contract before any other non-rated or lower-rated contracts."). *See also Id.* at 74–5. But, this does not necessarily mean that the contractor *must* make the guns.

Section 2071(a)(2) is a catch-all provision. In applicable part, it reads:

The President is authorized ... (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

50 App. U.S.C. § 2071(a)(2).

Although § 2071(a)(2) grants the President authority to intervene in the market place, it does not state any specifics as to how this power is to be exercised. Therefore, it is necessary to look to the DPAS and FAR for further guidance. Once one does this, the Defendant's argument quickly unravels.

DPAS § 700.13(c)(1) is directly on point and controls this issue. It explicitly reserves the right for a manufacturer to refuse shipping priority rated goods where regularly established terms of sale or payment have not been met. In applicable part, § 700.13(c)(1) states:

(c) *Optional rejection.* Unless otherwise directed by Commerce, *rated orders may be rejected* in any of the following cases as long as a supplier does not discriminate among customers:

(1) *If the person placing the order is unwilling or unable to meet regularly established terms of sale or payment.*

15 C.F.R. § 700.13(c)(1) (emphasis added).

Since DPAS § 700.13 allowed the Defendant to stop delivery of its goods to the

Debtor for failure to make timely payments, the Defendant's argument that the DPA specifically required it to continue making shipments is faulty. Consequently, the DPA, in and of itself, cannot be a grounds for disallowing the Debtor from avoiding preferential transfers. Defendant's motion for summary judgment on this ground will be denied.

## IV. SECTION 547(C)(2)

Although certain transfers made in the ordinary course of business may satisfy the requirements set forth in § 547(b), the Bankruptcy Code permits a transferee to prevent the avoidance of preferential transfers by satisfying the three requirements set forth in 11 U.S.C. § 547(c)(2):

> (c) The trustee may not avoid under this section a transfer—
>
> * * * * * *
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).

■ The burden of proving, by a preponderance of the evidence, that a transfer was made in the ordinary course of the debtor's business within the meaning of § 547(c)(2) is on the recipient of the alleged preferential transfers. *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1047 (4th Cir.1994). *Accord In re Food Catering & Housing, Inc.*, 971 F.2d 396, 398 (9th Cir.1992); *In re Fred Hawes Organization, Inc.*, 957 F.2d 239, 243 (6th Cir.1992).

The Debtor concedes that the payments made to the Defendant were for debt incurred in the ordinary course of business. The Defendant accordingly satisfies the first hurdle of § 547(c)(2), namely, subsection A. The remaining two requirements of § 547(c)(2), subsections B and C, however, are heavily in dispute. The gravamen of the dispute is whether the court should consider as material any changed circumstances in the Defendant and Debtor's relationship, or within the defense industry as a whole, caused by the Middle East Crisis. It is in light of this question that the court must examine whether the Defendant has established that it meets the requirements of subsections B and C in this case.

### a. Subsection B's Subjective Test

■ Subsection B requires that payments be "made in the ordinary course of business or financial affairs of the debtor and the transferee." The focus of this inquiry is subjective, *i.e.* were the payments made in the ordinary course of dealings between the parties. *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 486 (4th Cir.1992) ("Those courts testing a transfer for 'ordinariness' under section 547(c)(2) have generally focused on the prior conduct of the parties ... and, particularly, whether payment resulted from any unusual action by either the debtor or creditor."); *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d at 1048 ("Because subsections B and C are written in the conjective, the use of subsection's B subjective approach under subsection C would render subsection C superfluous."). *Accord In re Food Catering & Housing, Inc.*, 971 F.2d at 398; *In re Fred Hawes Organization, Inc.*, 957 F.2d at 244. Subsection B hinges on the billing and payment practices between the Debtor and Defendant both before and during the preference period. *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 487–8; *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991). However, "there is no precise legal test which can be applied" in determining whether payments by the Debtor during the ninety day preference period were "made in the ordinary course of business"; "rather, th[e] court must engage in a 'peculiarly factual' analysis." *Lovett v. St. Johnsbury Trucking*, 931 F.2d at 497 (quoting *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir. 1989)).

■ While there is no rigid rule to what must be shown under subsection B, "the creditor needs [to] demonstrate some consistency with other business transactions between the debtor and creditor." *Id.* (citing

*In re Magic Circle Energy Corp.,* 64 B.R. 269, 272 (Bankr.W.D.Okla.1986)). Courts, therefore, look to a variety of factors in ascertaining whether transfers were made in the ordinary course of dealings between the parties. *Id.; See also In re Midway Airlines, Inc.,* 180 B.R. 1009, 1013 (Bankr. N.D.Ill.1995); *In re Century Brass Products, Inc.,* 121 B.R. 136 (Bankr.D.Conn.1990).

▪ Where a payment is made within the time established by a creditor's invoice, the transfer is deemed within the ordinary course of business. *In re Fred Hawes Organization, Inc.,* 957 F.2d at 244. Defendant's invoice demanded payment within thirty days before a service charge would accrue. The alleged preferential payments were made after this thirty day grace period. Consequently, the court must engage in further analysis. An important factor to consider is the Debtor's course of performance in paying the Defendant during the pre-preference period compared to the payments it made to the Defendant within the preference period. *In re Yurika Foods Corp.,* 888 F.2d 42, 44 (6th Cir.1989); *In re Decor Noel Corp.,* 134 B.R. 883, 888 (W.D.Tenn.1991).

▪ It appears that the parties disagree on when a transfer is deemed to have occurred where payment is made by check. This leads them to calculate different averages for the time between when invoices were issued and when they were paid. The Debtor directs the court to *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), for the proposition that, "[f]or the purposes of payment by ordinary check ... a 'transfer' as defined by § 101(54) occurs on the date of honor, and not before." *Id.* at 400, 112 S.Ct. at 1390. *Barnhill,* however, dealt with § 547(b) as opposed to § 547(c). The Supreme Court itself noted in *Barnhill* that the purposes behind the two subsections are different. Accordingly, it stated: "[W]e see no basis for concluding that the legislative history, particularly legislative history explicitly confined by its own terms to § 547(c), should cause us to adopt a 'date of delivery' rule for purposes of § 547(b)." *Id.* at 402, 112 S.Ct. at 1391. *Barnhill* thus left in place those decisions which utilized the date of delivery rule for

§ 547(c). Indeed, the Supreme Court in *Barnhill* went so far as to say in a footnote: "Those Courts of Appeal to have considered the issue are unanimous in concluding that a date of delivery rule should apply to check payments for purposes of § 547(c)." *Id.* at 402 n. 9, 112 S.Ct. at 1391 n. 9. One of the cases the footnote cites is *In re Continental Commodities, Inc.,* 841 F.2d 527 (4th Cir. 1988), which is still good law and binding on this court for § 547(c) purposes. *In re National Enterprises, Inc.,* 174 B.R. 429, 433 (Bankr.E.D.Va.1994) ("While the Supreme Court in *Barnhill* eschewed the use of legislative history in interpreting § 547(b), and may have cast some doubt upon the use of legislative history to interpret § 547(c), the Fourth Circuit, in *Continental Commodities* and its progeny, has adopted an interpretation of § 547(c) this Court is bound to follow."). This suggests that the Defendant's calculation is more accurate than the Debtor's figure.

The Defendant's calculation for the preference period average must then be compared to the average time of payment during the pre-preference period. The parties disagree on what time frame prior to the preference period the court should focus on in determining the pre-preference period average of when payments were made after the issuance of an invoice. The Defendant suggests the court use a period of nine months, while the Debtor argues the court should use a full year prior to the preference period. The Debtor points out that the majority of courts faced with this issue have examined past payment practices based on a twelve month period. *Lovett v. St. Johnsbury Trucking,* 931 F.2d at 498; *In re Fulghum Construction Corp.,* 872 F.2d at 743; *In re Decor Noel Corp.,* 134 B.R. at 889. Both parties miss the issue here. *See In re Valley Steel Corp.,* 182 B.R. 728, 736–7 (Bankr.W.D.Va.1995) ("The court rejects the *per se* rule laid down in *Gold Coast [Seed Co. v. Beachner Seed Co. (Matter of Gold Coast Seed Co.),* 24 B.R. 595 (9th Cir. BAP 1982)], *supra,* because such a bright line rule ignores the realities of commercial practice in the industry involved in this case and because it fails to give due consideration to the purposes that the ordi-

nary course of business exception is designed to serve.").

▮ Past payment history is simply a guide post to whether payments made during the preference period deviate from normal business practice. There is no magical formula in which the court takes a pre-preference period average and a preference period average, makes a calculation and derives its answer. *See In re Midway Airlines, Inc.,* 180 B.R. at 1013 ("Statistical comparisons, however, and differing lengths of time in payment per *In re Global Distribution Network, Inc.,* 103 B.R. 949, 954–56 (Bankr. N.D.Ill.1989), do not end the inquiry nor conclusively establish that the longer the time the Debtor took to pay the latter invoices, ipso facto, makes the payments out of the ordinary course of business ...". In short, whether § 547(c)(2)(B) has been satisfied is a factual issue with a multitude of factors to be considered.

This discussion leads the court to the crux of the matter—In determining whether subsection B has been satisfied, should the court factor in that the business relationship between the Debtor and the Defendant affected national security and, conversely, that national security affected their business relationship. In other words, should the court take into account the military conflict going on in the Persian Gulf in determining whether the alleged preferential payments fall within the ordinary course of business exception of § 547(c)(2).

▮ Congress has noted that the purposes behind § 547(b) are to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy ... [and to] facilitate the prime bankruptcy policy of equality of distribution among creditors." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138. The purpose behind the ordinary course of business exception is to "leave undisturbed normal financial relations because it does not detract from the general policy of the section to discourage unusual action by either the Debtor or its creditors during the Debtor's slide into Bankruptcy." *Id.* at 373–74. In other words, the showing that a transaction

is ordinary between a debtor and a creditor is required to assure that the creditor did nothing abnormal to gain advantage over other creditors. *In re Valley Steel Corp.,* 182 B.R. at 735. The court, therefore, would be remiss in disregarding factors that could *legitimately* influence the ordinary course of dealings between the parties. One such factor could be the Persian Gulf conflict, if it impacted the ordinary course of affairs between the Debtor and Defendant.

▮ In order for a creditor to raise the shield of § 547(c)(2), under subsection B it must show that the payments made to it during the preference period were in the normal course of its business relationship with the debtor, *i.e.* "made in the ordinary course of business or financial affairs of the debtor and the transferee." The intervention of a war, or fierce military conflict, may transform the field upon which parties carry out their business affairs with each other, *i.e.* what was normal during peace time, may no longer make sense during war. Accordingly, their business relationship may change to reflect these altered conditions. Courts may account for this change, so long as there is some consistency with the past payment history of the parties. *Lovett v. St. Johnsbury Trucking,* 931 F.2d at 497. This is not to say, that the court's analysis under § 547(c)(2)(B) should change where military strife simply makes it more difficult for a debtor to make timely payments for reasons unilaterally affecting the debtor, such as a decrease in sales caused by the war. *See, e.g., In re Lease–A–Fleet, Inc.,* 141 B.R. 853 (Bankr.E.D.Pa.1992) (where the court did not consider the Persian Gulf crisis's negative impact on a debtor's ability to make sales, which in turn made making timely payments to its creditors difficult). Rather, the court's inquiry must focus on the business relationship between the parties, which many times will require a case-by-case analysis. *In re Midway Airlines, Inc.,* 180 B.R. at 1013; *In re Century Brass Products, Inc.,* 121 B.R. 136. If a relationship is transformed by an outside military conflict, in keeping with the purposes of § 547(c)(2), the court should not blind itself to the outside world and mindlessly make statistical comparisons. *In re*

*Midway Airlines, Inc.,* 180 B.R. at 1013. If the Persian Gulf crisis forced the parties to vary past payment practices by altering their business relationship, as long as this variation is not a total departure from past payment practices, the court may account for this unique change of circumstances in its subsection B analysis.

For these reasons, the court is left with several factual determinations to be made at trial. First, the court must determine the applicable time frame by which to derive the average time prior to the preference period that it took for the Debtor pay the Defendant's invoices. This pre-preference period average must be compared with the average time of payments during the preference period. However, the court's inquiry does not end with this comparison. The court must also determine whether the Persian Gulf crisis altered the parties business relationship. If the court finds that it did, then the next question becomes to what extent was the relationship affected by the conflict. Conceivably, these military operations may fully account for any difference between the pre-preference and preference period averages. Only after all of these factual determinations have been made, and factored into the § 547(c)(2)(B) equation, can the court decide whether Debtor's payments to the Defendant during the preference period were in the ordinary course of business or financial affairs of Debtor and of Defendant. Since these factors are materially in dispute, summary judgment must be denied as to § 547(c)(2) on subsection § 547(c)(2)(B) grounds.

### b. *Subsection C's Objective Test*

 In contrast to subsection B, subsection C is an objective test. Subsection C accordingly concerns itself on industry-wide practices as opposed to the relationship between the parties. As adopted by the Fourth Circuit, the objective test of subsection C encompasses a broad range of terms in the industry and allows a creditor considerable latitude in defining what the relevant industry is. *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d at 1050–1. *See also In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1033

(7th Cir.1993); *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.,* 18 F.3d 217, 226 (3d Cir.1994). As with subsection B, the purpose behind subsection C is to allow for reasonable business transactions to continue between debtors and creditors. Therefore, while "subsection C never tolerates a gross departure from the industry norm," it does provide the court considerable leeway in determining what is normal in the industry. *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d at 1050. Once again, as with subsection B, what is normal inside a given industry is a factual issue, resting on a variety of factors. *Lovett v. St. Johnsbury Trucking,* 931 F.2d at 499. Accordingly, the court's previous analysis as to what may be considered for subsection B purposes is very similar to that under subsection C. The difference, however, is the court's focus shifts from the individual relationship between the Debtor and Defendant to the relevant industry as a whole. Accordingly, if the court is to factor in the Persian Gulf crisis for § 547(c)(2)(C) purposes, it must determine that the conflict affected payment practices on an industry-wide basis.

 The parties disagree as to what the standard industry practice is in regard to late payments. Both parties supply affidavits in support of their positions. *See* Affidavit of Paul B. Lingeman; Affidavit of Richard L. Brown. Consequently, there are genuine issues of material fact which must be decided before the court can rule on this matter. *See In re Ajayem Lumber Corp.,* 143 B.R. 347, 353 (Bankr.S.D.N.Y.1992) ("Without agreement between the parties as to such industry standards, this court would require an evidentiary hearing to determine the standards."). Furthermore, the Affidavit of Paul B. Lingeman supporting the Defendant's motion for summary judgment is on belief, not personal knowledge. It is therefore insufficient for summary judgment purposes. Fed. R.Civ.Pro. 56(e), made applicable by Fed. R.Bankr.Pro. 7056.

In conclusion, the Defendant's motion for summary judgment only emphasizes to the court the peculiarly factual nature of § 547(c)(2). While the Defendant may be correct that the court should account for

Desert Storm and Shield in its § 547(c)(2) inquiry, it has not proven that the court must take into account this crisis, let alone proven that it is entitled to summary judgment on these grounds. Therefore, since these factors are materially in dispute, summary judgment must be denied as to § 547(c)(2) on subsection § 547(c)(2)(C) grounds.

## V. SECTION 547(C)(4)'S NEW VALUE EXCEPTION

■ Section 547(c)(4) of the Bankruptcy Code is a statutory offset rule under which a creditor may reduce an otherwise avoidable preference to the amount that the creditor gives new value to the debtor after receiving a preferential transfer. *In re Ajayem Lumber Corp.*, 143 B.R. at 353. It states that a trustee is precluded from avoiding a transfer:

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4).

■ The Fourth Circuit has adopted the *Garland* rule in analyzing § 547(c)(4). *In re Meredith Manor, Inc.*, 902 F.2d 257, 259 (4th Cir.1990) (citing *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982)). The *Garland* case modified the net result rule of § 547(c)(4) by requiring new value to come *after* a preferential transfer. *In re Thomas W. Garland, Inc.*, 19 B.R. at 926. The Fourth Circuit consequently looks at the ninety day preference period and calculates the difference between the total preferences and the total advances, *provided that each advance is used to offset only prior preferential transfers*. *In re Meredith Manor, Inc.*, 902 F.2d at 259 (emphasis added). *Accord, e.g., In re Transport Associates, Inc.*, 171 B.R. 232, 238 (Bankr.W.D.Ky.1994) ("It protects a transfer from preference attack to the extent that a creditor *thereafter* replenishes the estate."); *In re IRFM, Inc.*, 144 B.R. 886, 892 (Bankr.C.D.Cal.1992), *aff'd*, 52 F.3d 228 (9th Cir.1995) ("§ 547(c)(4)'s subsequent

advance rule makes preferential transfers avoidable until offset by subsequent advances of new value."); *In re Amick*, 163 B.R. 589, 593 (Bankr.D.Idaho 1994) ("[T]he grant of new value should apply to offset any preference, so long as the preferential payment was made before the new value was given.").

■ The parties agree that a check by the Debtor to the Defendant cleared on January 30, 1991 in the amount of $17,801.71. This check was in satisfaction of several past due debts. The Debtor is now alleging that this payment was a preferential transfer. After cashing this check on January 30, 1991, the Defendant made three subsequent shipments to the Debtor: (1) $12,546 in goods shipped January 31, 1991; (2) $4,551 in goods shipped February 13, 1991; and (3) $13,284 in goods shipped February 4, 1991. *See* Appendix B. The Defendant contends that these three shipments provided the Debtor with new value in the amount of $30,381.

The Debtor does not deny receiving these shipments. Instead, it alleges that the January 31, 1991 shipment for $12,546.00 was paid for on April 8, 1991 by a check numbered 016180. This check, in the amount of $41,-561.20, was payment for several outstanding invoices, including one issued January 31, 1991 for $12,546.00, invoice number 34432. While the Debtor may be correct, that it paid the Defendant for the January 31, 1991 shipment, such payment occurred during the ninety day preference period. The payment therefore is a preferential transfer, and it is avoidable unless a § 547(c) exception applies. Pursuant to § 547(c)(4)(B), the Debtor cannot wipe away Defendant's new value claim by saying that it paid the Defendant and then avoid the payment as a preferential transfer. That would be allowing Debtor to have his cake and to eat it too. *In re IRFM, Inc.*, 52 F.3d at 231; *In re Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1091 (5th Cir.1994).

■ Furthermore, the Defendant may only offset advances of new value to the extent of prior preferential transfers. The only preferential payment made prior to the three shipments totalled $17,801.71. Therefore, the most the Defendant may offset as new value is $17,801.71.

The Debtor concedes it did not reimburse the Defendant for the February 4, 1991 and February 13, 1991 shipments, totalling $17,835 in value. It further admits that these shipments occurred after the Debtor's check number 015168 for $17,801.71 cleared on January 30, 1991. Subtracting these two shipments from prior preference payments more than offsets them. Accordingly, there is nothing left for the Defendant to offset. The additional $12,546.00 is, therefore, a moot issue.

Since the Debtor concedes that the first "two shipments occurred after the preferential check number 015168 in the amount of $17,801.71" and, therefore, admits that the Defendant is entitled to a setoff in that amount, the court will grant partial summary judgment to the Defendant and offset the Debtor's preference claim by $17,801.71.

## VI. CONCLUSION

For the above mentioned reasons, the court will grant partial summary judgment on Products Support, Inc.'s Motion to Dismiss Count 3 to Avoid and Recover Preferential Transfers to the extent of $17,801.71. The Defendant's motion for summary judgment will be denied on all other grounds.

Appendix A

### PREFERENCE PERIOD PAYMENT CHART

| INVOICE NO. | DATE OF INVOICE | AMOUNT OF INVOICE | DATE INVOICE PAID |
|---|---|---|---|
| 34232 | 11/15/90 | $ 811.85 | 01/26/91 |
| 34235 | 11/15/90 | 273.46 | 01/26/91 |
| 34251 | 11/26/90 | 4,049.40 | 01/26/91 |
| 34261 | 11/29/90 | 800.00 | 01/26/91 |
| 34261 | 11/29/90 | 575.00 | 01/26/91 |
| 34290 | 12/04/90 | 11,292.00 | 01/26/91 |
| 34260 | 11/29/90 | 8,856.00 | 02/21/91 |
| 34243 | 11/20/90 | 10,380.00 | 02/21/91 |
| 34247 | 11/26/90 | 8,118.00 | 02/21/91 |
| 34252 | 11/27/90 | 6,888.00 | 02/21/91 |
| 34302 | 12/11/90 | 3,700.00 | 03/25/91 |
| 34314 | 12/14/90 | 8,821.44 | 03/25/91 |
| 34318 | 12/17/90 | 390.00 | 03/25/91 |
| 34319 | 12/17/90 | 1,943.00 | 03/25/91 |
| 34320 | 12/17/90 | 495.00 | 03/25/91 |
| 34323 | 12/18/90 | 7,380.00 | 03/25/91 |
| 34337 | 12/26/90 | 13,284.00 | 03/25/91 |
| 34338 | 12/26/90 | 1,440.00 | 03/25/91 |
| 34341 | 12/26/90 | 12,546.00 | 03/25/91 |
| 34359 | 01/03/91 | 2,096.64 | 03/25/91 |
| 34389 | 01/16/91 | 606.25 | 04/08/91 |
| 34396 | 01/18/91 | 7,134.00 | 04/08/91 |
| 34398 | 01/21/91 | 5,950.15 | 04/08/91 |
| 34399 | 01/21/91 | 2,037.75 | 04/08/91 |
| 34400 | 01/21/91 | 7,380.00 | 04/08/91 |
| 34404 | 01/23/91 | 1,565.70 | 04/08/91 |
| 34407 | 01/25/91 | 1,872.70 | 04/08/91 |
| 34417 | 01/28/91 | 2,468.65 | 04/08/91 |
| 34432 | 01/31/91 | 12,546.00 | 04/08/91 |

Appendix B

## NEW VALUE CHART