In re R.M.L., INC., previously known
as Intershoe, Inc., Debtor.

OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS OF R.M.L., INC.,
previously known as Intershoe, Inc.,
Plaintiff,

v.

Conceria SABRINA S.P.A., Defendant.

Bankruptcy No. 1–92–00419.
Adv. No. 1–93–0248.

United States Bankruptcy Court,
M.D. Pennsylvania.

May 9, 1996.

Pace Reich, Philadelphia, PA, for Plaintiff.

Gilbert A. Lazarus, Lester A. Lazarus P.C., New York City, Arnold E. Cohen, Klehr Harrison Harvey Branzburg & Ellers, Philadelphia, PA, for Defendant.

### *MEMORANDUM*

ROBERT J. WOODSIDE, Chief Judge.

Before me is the Complaint of The Official Committee of Unsecured Creditors of R.M.L., Inc., previously known as Intershoe, Inc. (the "Committee"), seeking to recover $846,791.07, representing payments made by debtor Intershoe, Inc. ("Intershoe") to defendant Conceria Sabrina ("Sabrina"). The Committee brought its claims pursuant to

Sections 547(b) and 548(a)(2) of the Bankruptcy Code, and also seeks an award of prejudgment interest. For the reasons stated below, judgment will be rendered on the claim under Section 547 in favor of the Committee and against Sabrina in the amount of $363,575.99, and judgment will be rendered in favor of Sabrina and against the Committee on the claim under Section 548.

### Procedural history

On February 18, 1992, Intershoe filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On January 20, 1993, I issued an Order confirming the Chapter 11 plan of reorganization submitted by Intershoe. Pursuant to the terms of the confirmed plan, all claims of Intershoe for the avoidance of preferential and fraudulent transfers pursuant to Sections 547, 548 and 550 of the Bankruptcy Code were assigned to the Committee to pursue for the benefit of unsecured creditors.

On July 30, 1993, the Committee initiated the instant adversary proceeding against Sabrina, initially bringing only a claim under Section 547 of the Bankruptcy Code. Sabrina filed an answer, and extensive discovery ensued.

On June 6, 1994, the Committee filed a motion for leave to amend the Complaint to bring an additional claim under Section 548 of the Bankruptcy Code, which Sabrina opposed. On September 26, 1994, I conducted a hearing regarding the amendment, and on October 3, 1994, I issued an Order permitting amendment. The Committee filed the Amended Complaint on October 11, 1994, and Sabrina filed an Answer on October 17, 1994. Discovery proceeded on the Section 548 issues.

Subsequently the Committee twice amended its Amended Complaint with Sabrina's consent. Sabrina filed appropriate answers.

On July 5, 1995, I conducted a trial. At Sabrina's request, I allowed the record to remain open for the parties to submit the trial deposition of Eduardo Rossi ("Rossi"). On August 9, 1995, the parties conducted Rossi's deposition and subsequently lodged the transcript with the Court.

On October 6, 1995, I granted the Committee's motion for leave to take several additional trial depositions for purposes of rebuttal. Although the Committee attached several pages from one of the depositions to its reply brief, the parties did not lodge the entire transcripts with the Court.

The parties have filed their proposed findings of fact and conclusions of law and their respective briefs. All matters raised in the amended pleadings are ready for decision.

### Factual findings

1. At all times relevant to the Complaint, Intershoe engaged in the business of large-scale wholesale distribution of women's shoes, importing the bulk of its product lines from manufacturers in Italy, Spain and Yugoslavia.

2. Sabrina is a leather tannery which sells prepared skins. Sabrina leather was used as raw material in the manufacture of shoes made for Intershoe by factories in Yugoslavia.

3. During the late 1980's, Dukes Beograd Ltd. and Dukes London Ltd. (collectively "Dukes") functioned as a trade and purchasing agent for Intershoe in procuring supplies and services in connection with the manufacture of shoes in Yugoslavia. Dukes was owned by Mr. Savo Djukic and had no direct corporate relationship with Intershoe. The use of a Yugoslavia-based trading company was either a requirement or an expedient under local law in importing materials and commissioning and coordinating the manufacture and export of shoes from factories located in Yugoslavia.

4. Although the manner in which Intershoe and Dukes operated may have varied, at various times Dukes received orders from Intershoe, placed orders with the Yugoslavian factories, purchased raw materials from Italian suppliers such as Sabrina, arranged for delivery of the materials to the Yugoslavian factories, and coordinated shipment of the finished goods to Intershoe in the United States.

5. Ordinarily, foreign factories manufacturing shoes for Intershoe, such as those located in Italy and Spain, purchased their

own raw materials. The Yugoslavian factories, however, were thinly capitalized and apparently were unable to generate sufficient credit. It is for this reason that Dukes (acting as Intershoe's trade/purchasing agent) actually placed orders for the purchase of raw materials for use in the Yugoslavian factories in the manufacture of shoes to be sold by Intershoe.

6. By the fall of 1990, a dispute developed between Intershoe and Dukes, and, subsequent to November, 1990, Intershoe ceased utilizing Dukes as a trade agent. Instead, Intershoe began using I.S. International as a trade and purchasing agent for buying materials for use by Yugoslavian factories in the manufacture of shoes to be sold by Intershoe.

7. I.S. International was a London-based company owned by Intershoe's principal, Ivan Rempel, organized for the purpose of selling various lines of shoes in European markets. Its role as a trade and purchasing agent for Intershoe in dealing with the Yugoslavian factories was a secondary role which served as a convenience based upon its location in Europe.

8. Although I.S. International was organized to sell shoes in European markets, it generally sold different lines of shoes than did Intershoe; it did not actually begin to take orders for purchase until May or June of 1991; it did not itself purchase the raw materials that were used as the components in the manufacture of the shoes it sold; and it did not itself sell shoes that were manufactured in Yugoslavia. The evidence was undisputed that, with respect to all relevant transactions involving the purchase of leather from Sabrina, I.S. International acted solely in its capacity as a trade/purchasing agent for Intershoe in essentially the same manner as did Dukes.

9. With respect to all transactions at issue involving I.S. International, it instructed Intershoe to pay the Yugoslavian factories and the Italian suppliers directly, rather than funneling payment through I.S. International. For example, if a shoe cost $10.00 to manufacture, Intershoe would pay $8.00 to the suppliers in Italy and $2.00 to the factory in Yugoslavia.

10. By the Spring of 1991, Sabrina's director of accounts, Silvano Da Maso ("Da Maso"), became concerned regarding payment for Sabrina leather invoiced to Dukes, and he met with Eduardo Rossi ("Rossi"), Intershoe's representative in Italy.

11. Rossi assured Da Maso that, if Dukes did not pay Sabrina, Intershoe would tender full payment. Rossi confirmed this guarantee with a letter dated March 7, 1991. With power of attorney for Intershoe, Rossi subsequently issued formal written guarantees of payment with respect to individual shipments of leather invoiced to I.S. International, pursuant to which Intershoe was required to pay Sabrina invoices immediately upon their respective due dates if I.S. International failed to pay.[1]

12. Under similar circumstances, Intershoe guaranteed payments for the benefit of suppliers of raw materials other than Sabrina.

13. By June, 1991, Intershoe advised Sabrina that it had organized a separate, wholly-owned subsidiary corporation, Yugoslav Footwear Export D.O.O. ("Yugoslav Footwear") to serve as a trading company in Yugoslavia. In all material respects, the relationship between Intershoe, Yugoslav Footwear and Sabrina functioned in the same manner as the relationship between Intershoe, I.S. International and Sabrina.

14. Intershoe's payment history with respect to Sabrina may be summarized as follows:[2]

---

[1]. Rossi did not have authority to execute a guarantee for and did not guarantee any invoice not used to supply leather ultimately to be used in the manufacture of shoes destined to be distributed by Intershoe.

[2]. All factories identified below are in Yugoslavia; all lines of shoes identified were distributed by Intershoe; most of the lines were not lines which were distributed by I.S. International.

Payment on invoices directed to I.S. International:

| Invoice Number | Date | Factory | Amount | Line | Due Date | Payment Amount/ Date |
|---|---|---|---|---|---|---|
| 5254 | 12/10/90 | | 4,694,008 | | 3/31/91* | *59,966,007 paid |
| 5255 | 12/10/90 | | 12,405,270 | | 3/31/91* | on 4/29/91; |
| 5293G | 12/18/90 | Bio | 2,792,402 | Jazz A | 3/31/91* | 9,128,967 paid |
| 5294G | 12/18/90 | CIK | 5,635,272 | Jazz | 3/31/91* | on 5/30/91 |
| 5295G | 12/18/90 | CIK | 11,986,748 | Jazz | 3/31/91* | |
| 5296G | 12/18/90 | Aida | 31,581,274 | Glacee | 3/31/91* | |
| 5G | 1/2/91 | Kvalitet | 7,859,247 | Glacee M | 4/30/91@ | @72,801,728 paid |
| 6G | 1/2/91 | Zenit | 12,806,063 | Glacee | 4/30/91@ | on 5/30/91 |
| 7G | 1/2/91 | Aida | 22,310,413 | Glacee | 4/30/91@ | |
| 8G | 1/2/91 | Zenit | 4,624,948 | Glacee | 4/31/91@ | |
| 9G | 1/2/91 | Aida | 25,201,057 | Glacee | 4/31/91@ | |
| 90G | 1/24/91 | Bio | 13,012,780 | Jazz | 4/30/91# | #47,754,771 paid |
| 91G | 1/24/91 | Zenit | 1,380,373 | Glacee | 4/30/91# | on 6/10/91 |
| 92G | 1/24/91 | Aida | 10,924,596 | Glacee | 4/30/91# | |
| 93G | 1/24/91 | Aida | 22,437,022 | Glacee | 4/30/91# | |
| 610G | 2/14/91 | Bio | 7,344,176 | Jazz A | 5/31/91 | full 6/27/91 |
| 657G | 2/21/91 | | 3,871,457 | | 5/31/91 | full 7/5/91 |
| 1590G | 4/8/91 | Borac | 90,282,070 | | 7/31/91+ | |
| 1591G | 4/8/91 | Borac | 56,378,250 | Glacee | 7/31/91+ | |
| 1601G | 4/11/91 | Kvalitet | 47,040,384 | Glacee | 7/31/91+ | +304,539,052 |
| 1602G | 4/11/91 | Kvalitet | 32,475,352 | Glacee | 7/31/91+ | paid 12/3/91 |
| 2057G | 5/8/91 | Zenit | 38,783,836 | Glacee P | 8/31/91+ | |
| 2066G | 5/10/91 | Kvalitet | 5,294,581 | Glacee | 8/31/91+ | |
| 2715G | 6/6/91 | Kvalitet | 18,778,499 | Glacee | 9/30/91+ | |
| 2716G | 6/6/91 | Borac | 3,558,331 | Glacee | 9/30/91+ | |
| 2717G | 6/6/91 | Kvalitet | 11,947,749 | Glacee | 9/30/91+ | |
| 2751G | 6/19/91 | Kvalitet | 15,448,421 | | 9/30/91^ | ^33,943,693 |
| 2923G | 6/27/91 | Zenit | 18,495,272 | Glacee | 9/30/91^ | paid 12/27/91 |
| 3449 | 7/24/91 | | 3,434,078 | | 10/31/91 | full 2/6/92 |
| 959 | 11/30/91 | | 13,659,313 | | 2/28/92 | unpaid |

Payment on invoices directed to Yugoslav Footwear:

| Invoice Number | Date | Factory | Amount | Line | Due Date | Payment Amount/ Date |
|---|---|---|---|---|---|---|
| 3653G | 7/29/91 | Zenit | 116,175,370 | | 10/31/91 | 66,531,922 paid 2/6/92 |
| 3654G | 7/29/91 | Kvalitet | 28,631,436 | | 10/31/91 | full 12/27/91 |
| 3658G | 7/29/91 | Marsala | 21,771,911 | | 10/31/91 | full 11/13/91 |
| 3655G | 7/29/91 | | 24,588,974 | | 10/31/91 | unpaid |
| 3659G | 7/29/91 | | 4,143,996 | | 10/31/91 | unpaid |
| 4185G | 9/18/91 | | 2,627,148 | | 12/31/91 | unpaid |
| 4186G | 9/18/91 | | 13,519,270 | | 12/31/91 | unpaid |
| 4187G | 9/18/91 | | 18,005,688 | | 12/31/91 | unpaid |
| 4188G | 9/18/91 | | 798,297 | | 12/31/91 | unpaid |
| 4189G | 9/18/91 | | 11,901,709 | | 12/31/91 | unpaid |
| 4657G | 10/11/91 | | 140,104,287 | | 1/31/92 | unpaid |
| 4658G | 10/11/91 | | 1,665,244 | | 1/31/92 | unpaid |
| 4659G | 10/11/91 | | 79,989,490 | | 1/31/92 | unpaid |
| 4826G | 10/28/91 | | 30,612,558 | | 1/31/92 | unpaid |
| 4827G | 10/28/91 | | 27,052,174 | | 1/31/92 | unpaid |
| 5277G | 11/11/91 | | 49,637,327 | | 2/28/92 | unpaid |
| 5278G | 11/11/91 | | 77,161,068 | | 2/28/92 | unpaid |
| 5305G | 11/18/91 | | 18,394,990 | | 2/28/92 | unpaid |
| 5306G | 11/18/91 | | 791,720 | | 2/28/92 | unpaid |
| 5332 | 11/25/91 | | 21,251,992 | | 2/28/92 | unpaid |
| 5333 | 11/25/91 | | 9,728,951 | | 2/28/92 | unpaid |
| 5454G | 11/25/91 | | 19,708,248 | | 2/28/92 | unpaid |
| 5455G | 11/25/91 | | 18,877,855 | | 2/28/92 | unpaid |

Payment on invoices directed to Dukes:

| Invoice Number | Date | Factory | Amount | Due Date | Payment Amount/ Date |
|---|---|---|---|---|---|
| 686G | 2/23/90 | | 184,348,675 | 5/31/90* | *106,960,000 paid 6/20/91; |
| 695G | 2/27/90 | | 61,421,548 | 5/27/90* | 105,195,655 paid 7/23/91 |
| 728G | 2/28/90 | | 189,114,241 | 5/28/90 | 199,970,000 paid 8/19 /91 [3] |

15. On or about May 3, 1991, Intershoe and Dukes entered into a settlement agreement (the "Intershoe/Dukes Agreement") reconciling their continuing disputes and litigation that had arisen therefrom.

16. Under the form of the Intershoe/Dukes Agreement offered into evidence, the parties agreed that Intershoe would pay Dukes $326,023.27, and that Dukes would pay various Italian suppliers 694,880,053 lira.

17. In the form of the Intershoe/Dukes Agreement offered into evidence, Intershoe also agreed to make direct payments to suppliers, including 200,000,000 lira to Sabrina. Such payments were described as follows:

At the same time as payment [of the $3,26,023.27, Intershoe will remit Lira to the Italian suppliers listed in paragraph 4(b) in Schedule 2 which monies are otherwise due to Dukes (London) from C.I.K. and due to C.I.K. from Intershoe.

18. The evidence at trial indicated that Intershoe satisfied its obligations under the Intershoe/Dukes Agreement and that, at least during some portion of time, Dukes did not satisfy its obligations. The evidence did not, however, indicate whether Dukes finally satisfied its obligations.

19. Regardless of Intershoe's and Dukes' respective obligations under the Intershoe/Dukes Agreement, Intershoe satisfied all outstanding obligations to Sabrina with respect to invoices 686, 695 and 728.

20. KPMG Peat Marwick ("Peat Marwick") was the public accounting firm engaged by Intershoe to complete annual financial audits, to prepare audited financial statements and to assist Intershoe with tax compliance.

21. In accordance with Generally Accepted Audit Standards ("GAAS"), Peat Marwick conducted a financial audit of Intershoe for the fiscal year ended August 31, 1991, and finalized an audited financial statement prepared in accordance with Generally Accepted Accounting Principles ("GAAP") on approximately November 15, 1991, in which it reported that, as of August 31, 1991, Intershoe's total liabilities exceeded its assets by approximately $4,055,000.00.

22. Intershoe's monthly internal operating statements also demonstrate the degree to which its financial condition had deteriorated by the fall of 1991 and continued to deteriorate. The October statement indicated a loss for the two months ending October 31, 1991, of $4,132,934.00; the November statement indicated a $390,514.00 loss for the month; the December statement indicated a $690,326.00 loss for the month; and the January statement indicated a loss of $1,245,069.00 for the month.

23. Intershoe's amended schedules and statements indicate an excess of liabilities over assets in the amount of approximately $14 million at the time Intershoe filed its Chapter 11 petition.

*Discussion*

A. *Section 547—Preference*

█ Section 547(b) of the Bankruptcy Code authorizes trustees to avoid transfers of a debtor's interest in property "if five conditions are satisfied and unless one of seven exceptions defined in subsection (c) is applicable." *Union Bank v. Wolas,* 502 U.S. 151, 154–55, 112 S.Ct. 527, 529–30, 116 L.Ed.2d 514 (1991). The statute provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any

3. It appears from the exhibits that the 199,970,000 amount, in addition to covering the full amount of invoice number 728, also covered a portion of amounts remaining due and owing after partial payments on invoice 695.

transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The trustee bears the burden of proving the above elements by a preponderance of the evidence. *See In re Biggs, Inc.,* 159 B.R. 737, 742 (Bankr. W.D.Pa.1993).

During the 90 days preceding the filing of Intershoe's Chapter 11 petition, Intershoe made the following payments to Sabrina totaling 437,080,181 lira:

Payments related to guarantees for Yugoslav Footwear:

| Date of Payment | Amount of Payment (Lira) |
|---|---|
| 12/27/91 | 28,631,436 |
| 2/6/92 | 66,531,922 |
| subtotal | 95,163,358 |

Payments related to guarantees for I.S. International:

| Date of Payment | Amount of Payment (Lira) |
|---|---|
| 12/3/91 | 304,539,052 |
| 12/27/91 | 33,943,693 |
| 2/6/92 | 3,434,078 |
| subtotal | 341,916,823 |

Through discovery, Sabrina admitted three of the five requisite elements of a preference: that it received the relevant payments from Intershoe in its capacity as a creditor; that the payments were received within the 90

days preceding Intershoe's Chapter 11 filing; and that the payments were made on account of antecedent debt owing from Intershoe to Sabrina. The requirements of Section 547(b)(1)(2) and (4) being satisfied, it remains to consider the requirements of Section 547(b)(3)˙ and (5), and whether Sabrina has met its burden of establishing any affirmative defense.

1. *Section 547(b)(3)—insolvency*

■ The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation...." 11 U.S.C. § 101(32)(A). This test is frequently referred to as the balance sheet test. Fair value, in the context of a going concern, generally is determined by "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *In re Roblin Industries, Inc.,* 78 F.3d 30, 35 (2d Cir.1996). The relevant date for determining the value of a company's assets is the time of the alleged transfer. *In re Morris Communications, Inc.,* 914 F.2d 458, 466 (4th Cir.1990); *In re Coated Sales, Inc.,* 144 B.R. 663, 668 (Bankr. S.D.N.Y.1992).

■ Pursuant to Section 547(f) of the Bankruptcy Code, a debtor is presumed to have been insolvent during the 90 days preceding the bankruptcy filing. This presumption places the burden on the creditor to go forward with evidence to rebut the presumption; however, the ultimate burden of proof that the debtor was insolvent remains with the trustee. *Biggs,* 159 B.R. at 742–43; *In re Total Technical Services, Inc.,* 150 B.R. 893, 899 (Bankr.D.Del.1993); *see also* 4 *Collier on Bankruptcy* ¶ 547.06, at 547–38–39 (15th ed. 1991).

■ In the instant case, the Committee relied upon the presumption that Intershoe was insolvent during the 90 days preceding its Chapter 11 filing. Additionally, the Committee offered the testimony of its expert, a certified public accountant, that Intershoe was insolvent on a fair value basis during the relevant 90–day time period. Finally, the Committee offered Intershoe's audited finan-

cial statement which indicates that, as of August 31, 1991, Intershoe's liabilities exceeded its assets by some $4 million.[4] Sabrina made no affirmative showing whatsoever in the face of this evidence. Under the circumstances, it is clear that the Committee met its burden with respect to Section 547(b)(3).

### 2. *Section 547(b)(5)—liquidation analysis*

■ In order to establish that the requirement of Section 547(b)(5) is met, a plaintiff in a preference case must offer evidence that unsecured creditors will receive less than one hundred percent recovery on their claims in the bankruptcy case. *In re Lan Yik Foods Corp.*, 185 B.R. 103, 108–09 (Bankr.E.D.N.Y.1995); *In re Tire Kings of America, Inc.*, 164 B.R. 40, 41–42 (Bankr. M.D.Pa.1993). The Committee offered Intershoe's bankruptcy schedules which indicated that, as of the time of its Chapter 11 filing, Intershoe's liabilities exceeded its assets by some $14 million. Additionally, the Committee's accountant specifically testified that, if Intershoe's bankruptcy case had proceeded under Chapter 7 of the Bankruptcy Code, unsecured creditors would have received no distribution. Sabrina offered no contrary evidence. Accordingly, I find that the Committee has met its burden of proof under Section 547(b)(5).

### 3. *Ordinary course defense*

■ The Committee having met its burden under all subsections of Section 547(b), judgment is appropriate in its favor on the preference claim, unless Sabrina establishes an affirmative defense. Sabrina has asserted the "ordinary course of business" defense under to Section 547(c)(2). Pursuant to Section 547(c)(2), Sabrina must establish that the otherwise preferential transfers to it were:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2); *see also Biggs*, 159 B.R. at 743.

■ The purpose of the "ordinary course of business" exception is:

to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

*In re Richardson*, 94 B.R. 56, 59 (Bankr. E.D.Pa.1988) (quoting H.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6329). More particularly, the Third Circuit described the purpose of a preference action and the function of the "ordinary course of business" exception as follows:

On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a

---

**4.** Sabrina sought to strike the testimony of the Committee's accountant on the ground that the Committee did not provide Sabrina with a written report regarding the accountant's opinion. However, pursuant to standing order, the particularized disclosure requirements of amended Fed.R.Civ.P. 26 have been waived in this Court, limiting the Committee's obligation to the filing of answers to expert interrogatories, which it did. The Committee disclosed both its accountant's opinion that Intershoe was insolvent and the fact that the audited financial statement would be relied upon in support of that contention. Addi-

tionally, the Committee made its accountant available for deposition, which opportunity Sabrina declined. For these reasons, Sabrina's motion to strike is denied and its objections to the accountant's testimony overruled insofar as the testimony and evidence was offered to establish only that Intershoe was insolvent within the 90 days preceding its Chapter 11 filing. The evidence offered by the Committee to establish that Intershoe was insolvent during the one year period preceding its Chapter 11 filing and the objections thereto are discussed further below.

distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

*In re Molded Acoustical Prod., Inc.,* 18 F.3d 217, 219 (3d Cir.1994).

 In order to qualify for treatment under the ordinary course of business exception, the transferee must establish that transfers of property were made in the normal course of business between the parties, and that the transfers were made according to ordinary business practices in the industry. *Molded Acoustical,* 18 F.3d at 223; *In re Fred Hawes Organization, Inc.,* 957 F.2d 239, 243–44 (6th Cir.1992); *Biggs,* 159 B.R. at 744; *In re Lila, Inc., slip op.,* 1993 WL 62382 (Bankr.E.D.Pa. Mar. 5, 1993) (collecting cases). These two distinct inquiries are often referred to respectively as the "subjective test" and the "objective test." *See Biggs,* 159 B.R. at 744. As to all elements of the exception, the burden of proof is upon the transferee, and the applicable standard of proof is the preponderance of the evidence standard. *In re Midway Airlines, Inc.,* 69 F.3d 792, 797 (7th Cir.1995); *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1047 (4th Cir. 1994).

### a. *Section 547(c)(2)(A)—debt incurred in ordinary course*

 The Committee disputes whether the Intershoe obligations at issue were incurred in the ordinary course of business between the parties for purposes of Section 547(c)(2)(A). While the Committee's arguments to this effect are supported by some degree of logic, I am satisfied that the guarantee by a principal-in-interest of payment owed by its trade/purchasing agent is a sufficiently ordinary practice in business to satisfy the requirement. Testimony offered by Sabrina indicating that Intershoe guaranteed payments to other suppliers of raw materials supports this conclusion to a degree, and I take judicial notice that a guarantee is a standard commercial device.

### b. *Section 547(c)(2)(B)—the "subjective" inquiry*

 In determining whether the second requirement of Section 547(c)(2) is satis-fied, "the focus of the inquiry is subjective, *i.e.,* were the payments made in the ordinary course of dealings between the parties." *In re Daedalean, Inc.,* 193 B.R. 204, 211 (Bankr. D.Md.1996). Such determination is "peculiarly factual," and I normally consider factors such as:

> the length of time the parties have engaged in the type of dealing at issue, whether the subject transfer was in an amount more than usually paid, whether the payments were tendered in a manner different from previous payments, whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt, and whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

*Richardson,* 94 B.R. at 60 (citations omitted); *see also In re Grand Chevrolet, Inc.,* 25 F.3d 728, 732 (9th Cir.1994); *Fred Hawes,* 957 F.2d at 244; *In re Pittsburgh Cut Flower Co.,* 124 B.R. 451, 460–61 (Bankr.W.D.Pa. 1991). The creditor must demonstrate some consistency with other business transactions between the debtor and the creditor, rather than a rigid conformance to past transactions. *Daedalean,* 193 B.R. at 211; *Lan Yik,* 185 B.R. at 111.

 A comparison between a past payment history and the timing of the preferential payments often constitutes persuasive evidence that such payments were made outside the ordinary course of business. *See, e.g., In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032 (7th Cir.1993) (noting that late payments generally will not be in the ordinary course of business); *In re Anderson–Smith & Associates, Inc.,* 188 B.R. 679, 686 (Bankr.N.D.Ala.1995) (finding that late payment establishes a rebuttable presumption that payment was not made in the ordinary course of business); *In re Braniff, Inc.,* 154 B.R. 773, 780 (Bankr. M.D.Fla.1993) (same). The pre-preference period conduct of the parties often has been described as a "baseline of dealings" from which to determine the ordinariness of the preference payments. *See, e.g., Lan Yik,* 185 B.R. at 111.

Courts, however, generally have rejected a *per se* rule that late payments can never be ordinary. *See generally Grand Chevrolet,* 25 F.3d at 732. Instead, late payments may be protected under the ordinary course of business exception "if those payments are the ordinary practice of the debtor and the other two elements of § 547(c)(2) are proven." *Reading China and Glass Co. v. Loomis Co., slip op.,* 1992 WL 55707 (E.D.Pa. Mar. 11, 1992); *see also Grand Chevrolet,* 25 F.3d at 732; *In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989); *In re Parkline Corp.,* 185 B.R. 164, 169 (Bankr.D.N.J.1994); *Lan Yik,* 185 B.R. at 111; *In re Rave Communications, Inc.,* 128 B.R. 369, 372 (Bankr.S.D.N.Y.1991) (stating that "[l]ate payment in conformity with the prior course of dealing is in the ordinary course of business"). Thus, while an analysis of past payment history serves as a significant factor and a guide post, it is not always, by itself, determinative; rather, other relevant factors should be considered according to their appropriate weight under the circumstances. *Daedalean,* 193 B.R. at 213.

In the instant case, I first note that Sabrina's shipments generally were made on open credit supported by Intershoe's guarantee, with a specific due date written on the face of the invoice. Due dates generally were set an average of three to four months after invoice.

The Committee's evidence established that invoices were paid an average and median number of 30–32 days after the specified due date during the pre-preference period, and that, during the preference period, invoices were paid an average and median number of 94 days late.[5]

While late payment is not the only relevant criterion, given the large disparity in lateness as between the pre-preference and preference periods, Sabrina should have gone forward with some evidence to explain the lateness and reconcile it with the parties' ordinary business practice, i.e., the baseline of 30–31 days lateness. Sabrina did offer evidence that: during the preference period it never held up any shipment of leather to secure payment; it never instituted legal proceedings to recover amounts owed to it from Intershoe; it did not alter its credit terms for leather manufactured into shoes destined for Intershoe; and the preference payments were no larger than payments during the pre-preference period. These negative proofs, however, while relevant, do not function to explain the unusual lateness of the preference payments in ordinary business terms or to offset the weight of such lateness in the subjective analysis.[6] Under the circumstances and lacking such affirmative proof, I find that Sabrina has failed to meet its burden under Section 547(c)(2)(B). *Compare Molded Acoustical,* 18 F.3d at 228 (upholding conclusion that payments made 89 days late were outside of parties ordinary course relationship where prior pattern established that payments were normally made 58 days late); *In re National Enterprises, Inc.,* 172 B.R. 829, 833 (Bankr.E.D.Va.1994) (finding payments outside ordinary course of business when the lateness of payment more than doubled during the preference period as compared to prior practice); *In re Lila, Inc., slip op.,* 1993 WL 62382 (Bankr.E.D.Pa. Mar. 5, 1993) (finding ordinary course of business

---

5. In assessing the "baseline of dealings" of the parties, I agree with the Committee that the number of days between Intershoe's guarantee of Dukes' obligations to Sabrina and ultimate payment to Sabrina on that guarantee is not relevant. The Intershoe guarantee of Dukes' obligations was dissimilar to the guarantees of invoices to I.S. International and Yugoslav Footwear invoices, in that the guarantee was given after shipment of the raw materials from Sabrina and after the due date of payment on the invoice. In other words, the post-transaction guaranty of the Dukes invoices was not an ordinary course transaction and therefore should not be used as a yardstick to measure ordinary course transactions. The number of days between the date of execution of the Inter-

shoe/Dukes Agreement and ultimate payment by Intershoe of invoices directed to Dukes similarly lacks relevance due to the unusual nature of the transaction.

6. For example, the intervention of a war into parties' ordinary business relationship might be considered to establish a new ordinary course relationship. *See e.g., Daedalean,* 193 B.R. at 214 (finding that fact questions existed as to whether the Persian Gulf conflict established a new ordinary course of business between the debtor and a subcontractor with respect to late payments made by the debtor, precluding summary judgment on a preference claim).

between the parties to have been payment within 45 days after invoice, and payments made outside such period were deemed to be outside the ordinary course of business exception); *Samar Fashions, Inc. v. Private Line, Inc.*, 116 B.R. 417, 419–20 (E.D.Pa.1990) (holding payments made 88 and 110 days late to have been outside the ordinary course of business between parties where the debtor paid 45 days late on average); *In re Homes of Port Charlotte, Florida, Inc.*, 109 B.R. 489, 491 (Bankr.M.D.Fla.1990) (holding payments made over 76 days from the date of invoice to have been outside the ordinary course of business between the parties where the evidence established that the prior pattern between the parties was for debtor to pay 28–76 days after the invoice date).

### c. *Section 547(c)(2)(C)—The "objective" inquiry*

With regard to Section 547(c)(2)(C)'s objective element of the ordinary course of business defense, I must examine the factors identified above in the broader context of similar transactions between parties similarly situated. *Id.* Courts have had difficulty, however, in applying this analysis. To provide appropriate guidance, in *Tolona Pizza*, 3 F.3d at 1029, the Seventh Circuit held

> that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Id.* at 1033 (emphasis in original).

Defining "ordinary business terms" to encompass a broad range of terms used in the relevant industry spares the creditor the task of

> prov[ing] the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry.

*Molded Acoustical,* 18 F.3d at 224. Defining the relevant industry to encompass "firms similar in some general way to the creditor" recognizes that in most cases it is "difficult to identify the industry whose norm shall govern." *Advo–System,* 37 F.3d at 1049 (quoting *Tolona Pizza,* 3 F.3d at 1033).

In *Molded Acoustical,* the Third Circuit adopted and elaborated upon the Seventh Circuit's flexible approach "with a rule that subsection C countenances a greater departure from that range of terms [representative of the industry norm] the longer the *pre-insolvency* relationship between the debtor and creditor was solidified." *Molded Acoustical,* 18 F.3d at 220 (emphasis in original). *Molded Acoustical* is succinctly summarized as follows:

> Molded Acoustical says that the extent to which a preference payment's credit terms can stray from the industry norm yet still satisfy § 547(c)(2)(C) depends on the duration of the debtor-creditor relationship. "[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)." A "sliding-scale window" is thus placed around the industry norm. On one end of the spectrum, "[w]hen the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry." In such a case, only those "departures from [the] relevant industry's norms which are not so flagrant as to be 'unusual' remain within subsection C's protection." On the other end of the spectrum, "when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a safe haven in subsection C." In any event, "[e]ven when the debtor/creditor relationship has been well-settled prior to the

debtor's insolvency, should the creditor be unable to fit its terms within the sliding-scale window surrounding the established industry norm, the preferential transfer will not be deemed unavoidable by virtue of § 547(c)(2), although the terms of §§ 547(c)(2)(A) & (B) are fulfilled. That is to say, the parties' longstanding credit terms, although consistent as between them, may depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors."

*Advo–System,* 37 F.3d at 1049 (citations omitted) (quoting *Molded Acoustical,* 18 F.3d at 226); *see also Midway Airlines,* 69 F.3d at 797 (stating that "to satisfy section ·547(c)(2)(C), the creditor need establish only that its own dealings with the debtor are situated 'within the outer limits of normal industry practice' " (citation omitted)).

In the instant case, I note that the evidence on the industry standard was limited to evidence of the Intershoe/Sabrina payment history. I already have found, however, that the pre-preference period payment history differed substantially from the timing of the preference payments; therefore, to the extent that an industry standard could be established by evidence of the parties' relationship during the pre-preference period, that industry standard would not have been met by Intershoe during the preference period.

Moreover, I find Sabrina's failure to proffer any evidence of an industry standard exclusive of the parties' course of dealings to be fatal to its Section 547(c)(2) defense. While Sabrina's several-year course of dealings with Intershoe may have moved the *Molded Acoustical* analysis somewhere toward Sabrina's end of the sliding scale, the relationship was not of sufficient longevity to absolve Sabrina of any requirement of proffering any evidence whatsoever to establish a range of conduct in a relevant industry with which to compare the parties' practices. *Compare Roblin,* 78 F.3d at 43 (finding that

"the behavior of the parties cannot be sufficient in and of itself to sustain the creditor's burden of proof with respect to ordinary business terms in the industry"); *Midway Airlines,* 69 F.3d at 798 (same). Under the circumstances, I find that Sabrina has failed to meet its burden of proof under Section 547(c)(2)(C).

### 4. *Section 547(c)(4)—new value*

Under Section 547(c)(4), the provision of "new value" constitutes an affirmative defense to an otherwise voidable preference. Pursuant to the defense, a transfer is not avoidable to the extent the creditor can establish that the transfer was followed by an advance of new value to the debtor on an unsecured basis. *In re Lease–A–Fleet, Inc.,* 155 B.R. 666, 684 (Bankr.E.D.Pa.1993).[7] In order to calculate the amount of new value to be applied against preferential payments, most courts apply a "subsequent advance" method of calculation. The method

> looks at the 90–day preference period and calculates the difference between the total preferences and the total advances, provided that each advance is used to offset only prior (although not necessarily immediately prior) preferences.

*In re Meredith Manor, Inc.,* 902 F.2d 257, 259 (4th Cir.1990); *see also In re M & L Business Machine Co.,* 160 B.R. 851, 855 (Bankr.D.Colo.1993); *aff'd,* 167 B.R. 219 (D.Colo.1994); *In re Ladera Heights Community Hosp., Inc.,* 152 B.R. 964, 969 (Bankr.C.D.Cal.1993).

The burden of establishing the existence of new value and the amount of new value is on the creditor who has received the transfer. *In re Jet Florida Systems, Inc.,* 861 F.2d 1555, 1558–59 (11th Cir.1988), *cited affirmatively in In re Spada,* 903 F.2d 971, 976 (3d Cir.1990). The amount of new value must be proved with specificity. *In re Arrow Air, Inc.,* 940 F.2d 1463, 1466 (11th Cir.1991).

Although in its Answer Sabrina plead "new value" as a defense, it did not argue the issue in its brief. Sabrina's exhibit summarizing the Intershoe/Sabrina payment history does

---

7. Additionally, the debtor must not have made "an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. *In re Toyota of Jefferson, Inc.,* 14 F.3d 1088, 1091 (5th Cir.1994).

indicate that three invoices were issued after the dates of the preferential payments. However, no testimony was offered to establish the dates that shipment was made with respect to such invoices, *i.e.*, the dates that new value may have been advanced. Nor was any specific evidence, other than a reference to the three invoices, offered that would establish that Sabrina provided any leather for Intershoe's ultimate benefit after the date of the first preferential payment. Absent such proof, I find that Sabrina has failed to establish a new value defense pursuant to Section 547(c)(4) of the Bankruptcy Code.

### B. *Section 548—Fraudulent Transaction*

Pursuant to Section 548(a)(2) of the Bankruptcy Code, the Committee seeks to avoid Intershoe's guarantees to Sabrina and recover monies paid with respect to all transfers the Committee sought to recover on a preference theory, plus additional transfers which occurred within the one-year period preceding Intershoe's Chapter 11 filing as follows:

Payments related to Dukes:

| Date of Payment | Amount of Payment (Lira) |
| --- | --- |
| 6/20/91 | 106,960,000 |
| 7/23/91 | 105,195,655 |
| 8/19/91 | 199,970,000 |
| subtotal | 412,125,155 [8] |

Payments related to guarantees for Yugoslav Footwear and I.S. International:

| Date of Payment | Amount of Payment (Lira) |
| --- | --- |
| 4/29/91 | 59,966,007 |
| 5/30/91 | 9,128,967 |
| 5/30/91 | 72,801,728 |
| 6/10/91 | 47,754,771 |
| 6/27/91 | 7,344,176 |
| 7/5/91 | 3,871,457 |
| 11/13/91 | 21,771,911 |
| | 222,639,017 |

Section 548(a)(2) provides in relevant part:

the trustee may avoid any transfer of an interest of the debtor in property, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a). Section 548(a)(2) thus permits avoidance if the trustee can establish:

(1) that the debtor had an interest in property;

(2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition;

(3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and

(4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer."

*BFP v. Resolution Trust Corp.*, —— U.S. ——, ——, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556, *reh'g denied*, —— U.S. ——, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994); *Butler v. Lomas and Nettleton Co.*, 862 F.2d 1015, 1017 (3d Cir.1988).

The parties agree that, under Section 548 of the Bankruptcy Code, the ultimate burden of proof rests upon the Committee. *See Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (3d Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank, N.A.*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *Pittsburgh Cut Flower*, 124 B.R. at 456. However, the Committee contends that, once the plaintiff has made a *prima facie* case of a fraudulent transfer, the burden to proceed with the evidence shifts to the defendant. *See, e.g., In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 418–20 (D.Minn. 1990); *In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 994–95 (S.D.Ohio 1990).

The first two requirements of Section 548 are not in dispute. The parties disagree as to whether Intershoe received reasonably equivalent value in exchange for the transfers and whether Intershoe was insolvent at the time the relevant transfers occurred.

---

**8.** The Committee's Third Amended Complaint in-
correctly states this number as 704,133,884.

### 1. *Reasonably equivalent value*

█ The term "reasonably equivalent value" is not defined in the Bankruptcy Code.[9] Courts recently have rejected any fixed mathematical formula for determining reasonably equivalent value and instead have reviewed and considered the totality of the circumstances surrounding the transaction. *See Barrett v. Commonwealth Federal Savings and Loan Ass'n,* 939 F.2d 20, 23 (3d Cir.1991); *see also In re Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125–26 (5th Cir.1993) (stating that "[a]lthough the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value").

█ Preliminarily, I note that payments on an existing guarantee generally are considered to be for reasonably equivalent value. The courts generally recognize that "[a] proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy Code." *In re Walters,* 163 B.R. 575, 581 (Bankr.C.D.Cal.1994).

In this case, however, the Committee not only challenges the payment on Intershoe's guarantees to Sabrina as unsupported by reasonably equivalent value but also the guarantees themselves, which also occurred within the one year preceding Intershoe's Chapter 11 filing.

█ Generally transfers made or obligations incurred (including guarantees) solely for the benefit of third parties do not furnish reasonably equivalent value. *See In re Chicago, Missouri & Western Railway Co.,* 124 B.R. 769, 773 (Bankr.N.D.Ill.1991). However, exceptions to the general rule can be found where the debtor receives the benefit of the original consideration, *id.* at 773, or where the debtor and third party "are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree." *In re Pembroke Development Corp.,* 124 B.R. 398, 400 (Bankr.S.D.Fla.1991) (citation omitted).

In the instant case, through the admission of answers to interrogatories, the Committee established that the relevant transfers were made by Intershoe in payment of Sabrina invoices directed to third parties (Dukes, I.S. International and Yugoslav Footwear). The Committee contends that such evidence was sufficient to establish a *prima facie* case under Section 548(a)(2).

In response, Sabrina introduced uncontradicted testimony and documentary evidence, including the testimony of both Sabrina and Intershoe officers, that indicated that, with respect to all relevant transfers at issue: 1) Dukes, I.S. International and Yugoslav Footwear acted as Intershoe's authorized and disclosed trade/purchasing agents;[10] 2) Intershoe guaranteed payment on and paid only Sabrina invoices that related to leather to be used in the manufacture of shoes to be manufactured in Yugoslavia and destined for Intershoe; 3) without such guarantee, Sabrina may not have delivered the leather to the factories for manufacture into shoes destined for Intershoe; 4) with limited exception, Intershoe actually received the shoes manufactured from the leather for which it guaranteed payment; and 5) with limited exception, Intershoe paid the factories and material suppliers (including Sabrina) directly, satisfying both its obligation to pay its trade/purchasing agent for the shoes and its guarantee to the material suppliers (including Sabrina).

---

**9.** Of the three words, only the last is defined. Pursuant to Section 548(d)(2)(A), "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor...."

**10.** The parties argue extensively over whether transfers made by a parent company for the benefit of a subsidiary create sufficient indirect value in the parent to satisfy the requirement of Section 548. The instant case, however, is one where the subsidiary (Yugoslav Footwear), affiliate (I.S. International) or separate company (Dukes) acted as an agent for the transferor company (Intershoe) in the relevant transactions. The ultimate direct benefit of each transaction, then, was conferred on the transferor (Intershoe) and not the subsidiary, affiliate and/or agent. The principal/agent relationship entails a much more direct and significant benefit to the principal (transferor) than presented in many of the general parent/subsidiary cases.

The Committee countered by asserting that the evidence introduced by Sabrina was incompetent and inspecific as to whether Intershoe actually physically received the shoes manufactured from leather for which it paid Sabrina and thus whether Intershoe truly received the benefit of the transfers. The Committee identified three instances in which Intershoe may not have received the shoes and/or in which Intershoe may have made a double payment.

The specific exceptions, discussed below, however, do not prove the rule. I found the testimony of the Sabrina and Intershoe officers to be direct and specific in describing the relationship between Intershoe, its trade/purchasing agents and Sabrina. It is especially telling that the Committee produced no witness from Intershoe to rebut that testimony. To the extent the Committee's *prima facie* burden was met by Sabrina's admissions, Sabrina's evidence was more than sufficient to shift the burden back to the Committee to prove its case.

In other words, the testimony of Sabrina and Intershoe officers established that Intershoe realized some degree of benefit from its transfers to Sabrina, contrary to the Committee's assertion that no benefit was established. Because, with limited exception, the Committee's evidence was generalized (i.e., the invoices were directed to Dukes, I.S. International and Yugoslav Footwear, therefore, no benefit to Intershoe), Sabrina need only have offered generalized evidence (i.e., Dukes, I.S. International and Yugoslav Footwear were acting as Intershoe's trade/purchasing agents in the acquisition of materials and services for the manufacture of shoes to be sold by Intershoe) to shift the burden back to the Committee.

█ Indeed, any other rule would be patently unfair to the defendant. A supplier who is the beneficiary of a guarantee has little control over the consideration it provides, and it would be extremely burdensome to require the supplier, through discovery, to attempt to trace every single shipment of its goods through manufacturing, international commerce, and the hands of the guarantor's agents when all parties are fully aware that the materials are being used in the manufacture of goods to be delivered to the guarantor. A fraudulent conveyance defendant should be required to confront and meet particularized evidence adduced by a trustee or committee; it should not, however, be required to trace the entire history of every shipment of its merchandise to meet a generalized (and largely unsupported) contention that value intended for the debtor never actually arrived at its doorstep.

My conclusion as to the parties' respective burdens is supported by the decision of the Third Circuit in the *Metro Communications* case. There, an official committee of unsecured creditors sought, *inter alia*, to avoid an alleged fraudulent conveyance to a bank which financed a leveraged buyout ("LBO") of a Chapter 11 debtor's stock and received, in return, the debtor's guarantee of repayment and a security interest in the debtor's assets collateralizing the guarantee. The committee contended that the defendant gave no value in exchange for the guarantee and security interest.

In making its determination, the Third Circuit acknowledged that the debtor corporation, as the target in an LBO, receives no direct benefit in the transaction. *Metro Communications*, 945 F.2d at 646. However, the Third Circuit determined that "[i]f the consideration [the debtor] received from the transaction, even though indirect, approximates the value it gave [the acquiring corporation], this can satisfy the terms of the statute." *Metro Communications*, 945 F.2d at 646. The Third Circuit found indirect benefits in the debtor's ability to borrow working capital from the bank subsequent to the LBO. It also concluded that the bankruptcy court had failed to account for value produced by the LBO itself in terms of a "strong synergy" between the debtor and the acquiring corporation. *Metro Communications*, 945 F.2d at 647.[11]

---

11. The Third Circuit also found that, in valuing the cost of the debtor's guarantee, the right to contribution from co-guarantors needed to be balanced against the debt for which the debtor was liable. *Id.* at 648.

More importantly, the Third Circuit decided against the committee for having failed to go through the exercise of quantifying the value of the indirect benefits. It stated:

Although the [indirect benefits] no doubt had value, the Committee introduced no evidence to support its burden of showing that [the debtor] received less than reasonably equivalent value in exchange for its guaranty and security interest. The Committee acted on the blind assumption that they had no value....

*Id.* at 648. Thus the Circuit did not put the defendant through the difficult exercise of quantifying the exact value received in absence of specific evidence adduced by the committee. *See also In re Lawrence Paperboard Corp.,* 76 B.R. 866, 876 (Bankr.D.Mass. 1987) (stating that "[a]t trial, there will be no question that the Committee will have the burden of quantifying the consideration").

In the instant case, the Committee's generalized assertion that Intershoe received no value can similarly be characterized as "blind assumption," which was specifically rebutted by direct testimony adduced by Sabrina as to the relationship between Intershoe, its trade/purchasing agents and Sabrina, and Intershoe's status as the principal-in-interest with respect to all relevant transactions. To put issues of misdelivery or nondelivery fairly into play, I find that the Committee would have to offer particularized evidence. With limited exception, no such particularized evidence was offered; therefore, I find that the Committee has failed to meet its burden with regard to the bulk of the transactions.

The Committee did identify three particularized instances in which actual delivery was put into dispute: 1) the case of shoes stored at the Kvalitet factory when it was destroyed; 2) the case of approximately 85,000 pairs of shoes claimed not to have been delivered from the Aida factory; and 3) the case of the Intershoe/Dukes transactions.

### a. *the Kvalitet shoes*

■ With respect to the shoes destroyed in Kvalitet, Rossi's testimony was as follows:

A. At the end, I remember that we were holding in that factory only 117 pairs, and I received one phone call informing me that the factory had been destroyed.

Q. Do you know whether in the factory when it was destroyed there were supplies?

A. Practically no, because as I told you, we were at the end of the production. They had to ship to us only 117 pairs, so the balance of the quantity that we gave in that season, it had already been shipped.

Rossi Dep., at 130.

This might be a different case if it was a claim for recovery of the cost of materials to make 117 pairs of shoes. The Committee, however, offered no evidence from which a value could be placed upon those shoes. Moreover, in context, it is clear that the issue of 117 pairs of shoes is a de minimus issue. There is no basis to generalize from this incident a conclusion that the Intershoe/agent/Sabrina relationship wasn't exactly as described in the bulk of the testimony offered by Sabrina.

### b. *the Aida shoes*

■ The second exception involves a dispute between Intershoe, Dukes and the Aida factory in Yugoslavia involving approximately 81,000 pairs of shoes, a much more significant event. The Committee suggested that Intershoe paid Sabrina for leather sent to the Aida factory which was intended to be used in the manufacture of these shoes, which shoes either were not actually manufactured or did not ultimately reach Intershoe. The Committee pointed to several documents used to cross-examine Rossi which suggest that in the early summer of 1991, Intershoe was attempting to reconcile a dispute over the Aida shoes. A flavor of the Committee's proofs on this point can be gleaned from Rossi's testimony as follows:

Q. ... isn't it true that 812,294 [12] pairs of shoes were never shipped from the Aida factory to the United States?

A. Where is this written?

\* \* \* \* \* \*

12. The correct number of shoes appears to be 81,294, which appears on page 102 of the deposition.

Q. I would like you to look at Schedule 2, and look at No. 3.

A. No. 3, yes.

Q. Does that refresh your recollection that Aida had not shipped approximately $630,000 worth of shoes to Intershoe?

A. (In English) Just a moment. Let me see.

(Through the Interpreter) This, though, says something else.

The shoes were shipped. The materials were not paid for. The materials that were given to the factory were not paid for.

The shipment was made, the goods were shipped, but the factory had not paid for the goods that were used to then make the shoes.

Q. But Intershoe was supposed to recover from Aida $630,000, is that correct?

A. Yes.

Q. Wasn't Dukes supposed to sell shoes in the Soviet Union?

A. Yes.

Q. And weren't the shoes that Dukes was supposed to sell in the Soviet Union the shoes referred to in Schedule 3?

A. That is what was supposed to happen.

Q. And isn't it true that Dukes never sold those shoes?

A. It could have been.

Rossi Dep., at 100–02. Thus, the most specific evidence available with respect to the Aida shoes is that they were delivered into the hands of Dukes, Intershoe's authorized trade/purchasing agent, for sale in the former Soviet Union, and that Dukes may at some time actually have sold the shoes for Intershoe's benefit. It is difficult to imagine how some speculative liability on the part of Dukes may be transformed into a fraudulent conveyance action against Sabrina.[13]

The documentary proofs submitted by the Committee establish at most that, at some point around the Spring of 1991, there was a dispute over the Aida shoes and that the dispute continued at least through the consummation of the Intershoe/Dukes Agreement.[14] Without a witness to testify as to the future course of events, I am also unwilling to presume from the snapshot provided by the Committee that the Aida dispute never was finally resolved.

c. *the Intershoe/Dukes Agreement.*

■ Intershoe's guarantee of the invoices to Dukes and the associated Intershoe/Dukes Agreement present the most troubling set of circumstances. First, the guarantees were given with respect to payment for leather that already had been shipped; whereas, all other guarantees appear to have been pre-shipment guarantees. Therefore, the value Intershoe received from shoes made from the leather does not correlate as directly with the guarantees.

Additionally, the Committee's contention that Intershoe paid both Dukes and Sabrina with regard to the same leather finds some support in the evidence. The evidence established that Intershoe made all required payments under the Intershoe/Dukes Agreement. The evidence also established that Intershoe paid Sabrina 412,125,655 lira related to invoices 686, 695 and 728; however, under the Intershoe/Dukes Agreement, Intershoe's contribution with respect to these invoices would have been limited to 200,000,-000 lira.[15] Therefore, it appears that Inter-

---

13. To some extent, I understand the Committee's frustration in attempting to interpret foreign documents and interview domestic and foreign insiders of a defunct corporation (who have little incentive to remember) in order to trace international transactions. These imposing barriers, however, do not warrant a lightening of the Committee's burden. One must also be cognizant of Sabrina's frustration, having supplied all leather invoiced for Intershoe's ultimate benefit and merely having been paid by Intershoe pursuant to its guarantees, at being called to defend for allegedly not having given value to Intershoe.

14. The Aida shoes are referenced in Schedule 3 of the Intershoe/Dukes Agreement.

15. To the extent of the 200,000,000 lira, the Intershoe/Dukes Agreement states on its face that the payment to Sabrina by Intershoe was in lieu of making the same payments to other creditors: the agreement by its terms effected an offset of obligations between Dukes, C.I.K. (a Yugoslavian factory) and Intershoe. As previously noted, "[a] proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy Code." *Walters,* 163 B.R. at 581.

shoe may have paid Sabrina some 212,125,-655 lira which it was not obligated to pay under the form of the Intershoe/Dukes Agreement submitted into evidence. Additionally, the testimony confirmed that, at least during some portion of time, Dukes was withholding payments to the suppliers to which it had agreed under the Intershoe/Dukes Agreement.

Further than that, the evidence related to the Intershoe/Dukes Agreement was murky. One former Intershoe insider confirmed the existence of a double payment, while another discounted the possibility. None of the witnesses presented had comprehensive knowledge of the Intershoe/Dukes Agreement, and none was willing to testify that Dukes ultimately failed to fulfill its obligations thereunder.

Moreover, I have concerns about the extent to which the Intershoe/Dukes Agreement can be utilized by the Committee against Sabrina in absence of informed testimony to validate the document. Sabrina was not a party to the agreement such that it might constitute an admission. Former Intershoe insiders disagreed over the history of payment under the agreement. Additionally, at least one witness testified that the form of the agreement submitted into evidence was not the final form. Therefore, although both parties ultimately sought to refer to the agreement in their cases, I give limited weight to the document in terms of assessing whether the Committee has met its burden.

It must be remembered too that, by the time the Intershoe/Dukes Agreement was executed (whatever its final form), Intershoe already had guaranteed payment to Sabrina of the Dukes invoices. Therefore, regardless of whether Intershoe paid Dukes more than it was entitled to, Intershoe paid Sabrina once on its guarantee for leather from which it benefited. It appears that it is Dukes, not Sabrina, that may not have provided value relating to the payments it received under the Intershoe/Dukes Agreement. Again, whatever Intershoe's grievances may have been against its own former trade/purchasing agent, I conclude that they cannot be transformed into a fraudulent transactions case against Sabrina.

The guarantees of Dukes' performance themselves, while they occurred post-shipment, also were supported by value. First, the testimony indicated that Sabrina was reluctant to continue to ship leather to undercapitalized factories in Yugoslavia, an unstable part of the world, in absence of such guarantees. Thus, the guarantees had the effect of permitting a continued extension of credit to Intershoe's trade/purchasing agents, which kept Intershoe's foreign-commissioned production process intact. *Compare Metro Communications,* 945 F.2d at 646–47 (finding value in the continued ability to receive credit). Additionally, although Sabrina did not argue the point, it is likely that Intershoe's post-shipment guarantee of its agents' obligations was not necessary, as Intershoe already would have been liable for payment. As stated in American Jurisprudence 2d:

> It is a fundamental rule underlying the structure of agency law that the principal is bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal and within the scope of the agent's employment, or which the principal ratifies. Thus, a principal is bound by, and is liable upon, a contract executed properly as to form by his agent, within the actual or apparent authority of the agent, and with the understanding that the agent is contracting on behalf of the principal.

3 AM.JUR.2d *Agency* § 270 (1986) (footnotes omitted).[16]

In sum, the Committee's "blind assumption" that no value was provided by Sabrina

The Committee contends that there is no evidence that Intershoe ever received the appropriate credit from the C.I.K. factory. Again, I find the Committee attempting to turn the burden of proof on its head. In order to shift the burden of production to Sabrina, the Committee should have offered some credible evidence that the C.I.K. factory did not issue the credit; only thereafter could Sabrina be fairly called to offer evidence regarding the credit.

**16.** I note that the Committee's citation of a lay witness' characterization of Intershoe's pre-guarantee obligation to Sabrina in connection with the Dukes transactions as a "moral" obligation rather than a legal one carries very little weight. The witness was not a lawyer, was not qualified as an expert, and was not a Sabrina representa-

is rebutted by substantial evidence that: 1) Intershoe was the principal-in-interest and the actual or intended beneficiary of every single relevant transaction that was the subject of this case; and 2) Intershoe's guarantees had the effect of maintaining its agents' credit with Sabrina and permitting Intershoe to continue to commission manufacturing services from the Yugoslavian factories. In the face of Sabrina's evidence, the Committee offered no credible evidence that would suggest that Sabrina did not deliver all leather for which Intershoe paid to the factories for Intershoe's actual or intended benefit. Intershoe may have suffered a degree of loss at the hands of its own international trade/purchasing agents or may have suffered a volume loss for the fact that it chose to take the risk of commissioning manufacturing services in an economically unstable part of the world; however, the Committee failed to establish that the possibility of such losses took the obvious value provided by Sabrina outside the realm of reasonably equivalent value.

### 2. Insolvency

 In order to meet its burden under Section 548(a)(2), the Committee was required to establish that Intershoe was insolvent at the time of all relevant transfers, or, essentially, during the one year period preceding Intershoe's Chapter 11 filing. Sabrina has repeatedly objected to the admissibility of the expert testimony of the Committee's accountant on the ground that the Committee failed to produce information in discovery upon which it relied at trial.

Although I stated previously that Sabrina's objection would be overruled generally, I was troubled by the failure of the Committee to disclose in its answers to Sabrina's expert witness interrogatories its theory that Intershoe's financial statement covering August 31, 1990, and August 31, 1991, understated Intershoe's liabilities by some $3.4 million due to an improper classification of certain stock purchase warrants held by Westinghouse Corporation. While the theory was not necessary to establish that Intershoe was insolvent as of the August 31, 1991, date, the

theory was essential to the Committee's contention that Intershoe was insolvent during the prior 6 month period.

Because I have concluded that the Committee failed to establish a lack of reasonably equivalent value by a preponderance of the evidence, it is unnecessary to resolve this issue. I merely note that a decision as to the proper financial treatment of Intershoe's liabilities in light of the Westinghouse stock purchase warrants is unnecessary to my conclusion reached in connection with the Committee's preference claims that Intershoe was insolvent during the 90 days preceding its Chapter 11 filing.[17]

### C. Conversion of foreign currency

 The Committee argues that its judgment should be converted from Italian lira to American dollars as of the time of the contested transfers. Sabrina offered no counterargument and did not contest the Committee's conversion figures or arithmetic. Accordingly, pursuant to the Committee's request, I take judicial notice of the exchange rates from Italian lira into United States dollars as published in the Journal of Commerce or the Wall Street Journal, for the dates of the transfers, and the judgment on the preference claims in the amount of 437,-080,181 lira will be converted to $363,575.99.

### D. Prejudgment interest

 The award of prejudgment interest in a preference case is in the discretion of the bankruptcy court. I have generally followed a line of cases that awards prejudgment interest only where the defendant does not put forth a substantial defense. See, e.g., In re Lessig Constr., Inc., 67 B.R. 436, 437 (Bankr.E.D.Pa.1986); In re Demetralis, 57 B.R. 278, 284 (Bankr.N.D.Ill.1986).

I acknowledge the weakness of Sabrina's ordinary course defense in this case. However, a large portion of the effort and time in this case was expended with respect to the fraudulent transactions actions. In my judgment, the Committee's fraudulent transactions case was little stronger than Sabrina's ordinary course defense. The fraudulent

---

tive, such that the statement might be taken as an admission of sorts.

**17.** Both the unrebutted presumption of insolvency in the 90 days preceding the filing under Section 547(f) and Intershoe's audited financial statement support that determination.

transactions claim added nearly $500,000.00 to the Committee's trial demand, making settlement of the overall action, even at a moderate percentage of the demand, a dim prospect. Under the circumstances, I do not find it appropriate to charge Sabrina with pre-judgment interest with respect to any of the Committee's claims.

*Conclusions of law*

1. I have jurisdiction over the instant adversary proceeding pursuant to Sections 157 and 1334 of the Judicial Code. Pursuant to Section 157(b)(2)(F) and (H), the proceeding is core in nature.

2. The Committee satisfied its burden of establishing the elements of Section 547(b) by a preponderance of the evidence.

3. Sabrina failed to meet its burden of establishing the elements of Section 547(c)(2) or (4) by a preponderance of the evidence.

4. Judgment should be rendered in favor of the Committee and against Sabrina in the amount of $363,575.99, pursuant to Sections 547 and 550 of the Bankruptcy Code.

5. The Committee failed to meet its burden under Section 548(a)(2).

6. Under a review of the equities, an award of pre-judgment interest in favor of the Committee is not appropriate.